## UNITED STATES of America
### v.
## KENNECOTT COPPER CORPORATION, Defendant.

United States District Court
S. D. New York.

July 2, 1964.

William H. Orrick, Jr., Asst. Atty. Gen., Antitrust Division Dept. of Justice, Washington, D. C., Robert M. Morgenthau, U. S. Atty., for the Southern District of New York for plaintiff, and Jerome S. Wagshal, Jack L. Lipson, Arthur Cantor, and Edwin Weiss, Attys., Dept. of Justice, of counsel.

Sullivan & Cromwell, New York City, for defendant, and Arthur H. Dean, Howard T. Milman, Richard Price, and Paul R. Grand, New York City, of counsel.

DAWSON, District Judge.

This case presents an issue as to whether the acquisition by a large copper producer of the assets of a substantial independent copper fabricator is a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, reading as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

Pretrial proceedings resulted in the entry on September 11, 1963 of Pretrial Order No. 1. This order established that on November 24, 1958, and at all times thereafter, defendant Kennecott Copper Corporation had been a corporation engaged in commerce and subject to the jurisdiction of the Federal Trade Commission; that prior to November 24, 1958, Okonite Company (New Jersey) was a corporation engaged in commerce and subject to the jurisdiction of the Federal Trade Commission; and that on November 24, 1958, Okonite Company (Delaware) was and still is a wholly-owned subsidiary of the defendant Kennecott Copper Corporation; that on November 24, 1958, Okonite Company (Delaware) acquired the assets of the Okonite Company (New Jersey).[1]

The parties stipulated that the Court had jurisdiction to determine whether this transaction violated Section 7 of the Clayton Act. They also stipulated that the relevant section of the country, within the meaning of Section 7 of the Clayton Act, for purposes of the litigation, was the United States of America as a whole.

It was further stipulated that relevant lines of commerce for purposes of the litigation were (a) insulated wire and cable and (b) refined copper.

It was further stipulated that plaintiff contended and defendant denied that (i) paper insulated power cable is a submarket of insulated wire and cable and (ii) that copper wirebar is a submarket of refined copper; and that each such submarket is in and of itself a line of commerce within the meaning of Section 7 of the Clayton Act for purposes of the litigation.

The pretrial order provided that the issues remaining for trial were:

I. Is paper insulated power cable an appropriate line of commerce within which to measure the probable effects of Kennecott's acquisition of Okonite?

II. Is wirebar an appropriate line of commerce within which to measure the probable effects of Kennecott's acquisition of Okonite?

III. May the fact of Kennecott's acquisition of Okonite result in a substantial lessening of competition or a tendency to monopoly in any line of commerce?

Those issues were tried. The Court now renders its opinion, findings of fact and conclusions of law.

In order that we may properly consider the significance of the evidence on these three issues, it is necessary at the outset to describe the position of Kennecott Copper Corporation and the Okonite Company in the copper industry. On November 24, 1958, Kennecott Copper Corporation acquired the assets and business of the Okonite Company. Kennecott was at the time the world's largest copper producer. It admitted in its answer that it is the largest domestic copper producer. Okonite was the country's second largest independent insulated wire and cable fabricator. Since its acquisition Okonite Company has operated as a wholly-owned subsidiary of Kennecott. About a month after the acquisition of Okonite, Kennecott transferred its subsidiary, Kennecott Wire and Cable Company (KWC), to Okonite.

The basic steps in the copper industry are mining, milling, smelting, refining and fabrication. There has been a tendency in the industry toward integration in the major companies of all these steps. Kennecott is completely integrated through smelting and largely integrated through refining. It owns five mining properties located respectively in New Mexico, Nevada, Arizona, Utah and Chile. It owns a refinery at the Utah location which refines the Utah production and a refinery in Maryland which handles most of the output of the other properties. The American Smelting & Refining Company is under contract to refine the remaining production. Inte-

[1.] The Okonite Company (Delaware) was formed for the purpose of acquiring the assets of the Okonite Company (New Jersey).

gration through refining now appears to be a general rule in the industry in the large companies at least. Anaconda and Phelps Dodge had become integrated through refining at an earlier date than Kennecott.

Kennecott is also integrated to some extent through fabrication. Prior to its acquisition of Okonite, Kennecott had two wholly-owned subsidiaries engaged in copper fabricating operations, Chase Brass & Copper Company, Inc. and Kennecott Wire and Cable Company. These two subsidiaries reflected the two basic industries which are customers of refined copper, i. e., wire mills and brass mills. In 1958, 59.2% of refined copper consumption in the United States was by wire mills and 38.3% by brass mills.

In the years preceding the merger Kennecott was in general satisfied with its position in the brass mill industry. Chase Brass & Copper Company had 12–13% of the industry and consumed almost 40% of Kennecott's shipments of copper to brass mills. It had a young and alert management and was well able to expand, not only to maintain the company's share of the market, but to improve the company's position.

Kennecott was not satisfied with its position in the wire and cable industry, however. Its subsidiary in that field accounted for less than 2% of wire and cable sales and consumed only about 10% of Kennecott's shipments to wire and cable companies. Kennecott felt that in order to maintain or increase its competitive position in the wire and cable industry it would have to expand. It also felt it had to expand its fabrication facilities in order to market its copper.

In a memorandum to Kennecott's Board of Directors, the executive vice president of Kennecott stated in 1958:

" * * * In general, Kennecott's competitors in this hemisphere have been increasing their fabrication facilities through new plants and through acquisitions of fabricators. Some independent fabricators feel that they will in the future be squeezed by the integrated companies in their efforts to market their copper production.

"It, therefore, appears essential if Kennecott is to be able to sell its mine production of copper that Kennecott acquire additional fabrication to replace fabricating accounts which it will lose or which will purchase only reduced quantities from Kennecott."

In early 1958 contact was established with the Okonite Company and merger negotiations began.

Okonite was the second largest of the independent insulated wire and cable companies at the time it was acquired. Only Essex Wire & Cable was larger in the independent field. General Cable Company was also larger, but it had a close relationship with American Smelting & Refining Company which owned roughly one-third of its common stock and therefore in the industry was not considered an independent.

Okonite's manufacturing operations were carried on in three plants located at Passaic, Paterson and North Brunswick, New Jersey. It also had a nationwide chain of sales offices located in the principal cities of the country and warehouses in Birmingham, Chicago, San Francisco and Syracuse.

The Okonite management was young and progressive and was reputed to be one of the most able in the industry. As an independent, Okonite relied on research, leadership in engineering and a reputation for quality to help market its products and to earn premium prices where possible. It claimed to be a leader in its field in terms of know-how and production ability. Its product line was quite broad compared with other independent wire and cable companies.

Refined copper was Okonite's principal raw material. Most of the refined copper was purchased in the form of wirebar or the products of wirebar. It had no rod mill. In 1954 and 1955 Kennecott was Okonite's principal copper supplier, but Okonite's purchases from Kennecott

declined steadily from 1954 on. Okonite purchased 3,975 tons of copper from Kennecott in 1954; 2,959 tons in 1955; 1,961 tons in 1956 and 150 tons in 1957. There were no purchases in 1958 up to the time of the merger.

Kennecott's main purpose in expanding in fabrication was to assure a future market for the sale of its copper. In a memorandum sent by the executive vice president to Kennecott's board of directors in 1958, he wrote:

> "It is recommended that Kennecott acquire The Okonite Company, producers of insulated wire and cable, because the additional fabrication capacity will be essential to the future marketing of Kennecott's refined copper and will also provide a second profit on copper produced."

Okonite was interested in the merger for financial reasons. It felt it had to expand to survive and that Kennecott could supply the necessary capital.

We had, therefore, dynamic, economic forces which tended to promote integration in the industry. It was in response to those forces that this merger took place. This tendency existed in the entire copper industry. The other two big copper producers in the United States are Anaconda and Phelps Dodge. In 1922 Anaconda acquired the predecessor company of Anaconda Copper & Brass Company because it was convinced that in order to protect the business of the company it should be placed in a position to control the outlets of its metals and to promote the sale and distribution of copper and brass products. Anaconda, in 1929, formed the Anaconda Wire & Cable Company by a series of acquisitions. Phelps Dodge acquired a copper product subsidiary as a result of acquisition in 1930. It was this tendency toward integration on the part of its two largest competitors that spurred Kennecott into the acquisition of Okonite. Mr. Milliken, the president of Kennecott, testified (Tr. 2355–56):

> "Well, we thought we had a problem because, as I say, of this tendency

on the part of our competitors in this country, Anaconda and Phelps Dodge, expanding their capacity, and also what seemed to be the attitude of the independents that they couldn't make money in copper fabrication. If those two things were carried to a, let's say, ultimate conclusion, then we would be in serious trouble."

We will now proceed to a consideration of the issues which were set for trial:

■ I. *Is paper insulated power cable an appropriate line of commerce within which to measure the probable effects of Kennecott's acquisition of Okonite?*

Section 7 of the Clayton Act is designed to prevent any corporation from purchasing stocks or assets of another corporation when the effect of such acquisition would be substantially to lessen competition or tend to create a monopoly in any line of commerce in any section of the country. A determination of the effect of the acquisition necessarily presupposes that there be a determination of the line of commerce involved. It was stipulated in the pretrial order that among the relevant lines of commerce for the purposes of this litigation were (a) insulated wire and cable and (b) refined copper. The Government, however, contends that *paper insulated* power cable is an appropriate sub-line of commerce.

Certain practical indicia may be examined to determine whether a submarket exists in a line of commerce. Those which were identified in Brown Shoe Co. v. United States, 370 U.S. 294 at page 325, 82 S.Ct. 1502 at page 1524, 8 L.Ed. 2d 510 (1962), were as follows:

> "[I]ndustry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."

It has also been said by the Supreme Court that within a broad market "well-

defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524 (1962).

The question presented on this point is whether or not paper insulated power cable is a sufficiently distinctive submarket of insulated wire and cable to constitute a line of commerce in and of itself. The common physical characteristic of all types of paper insulated power cable, which distinguishes it from other types of power cable, is that the insulation of paper insulated power cable is made of strips of high quality paper which are wound around the conductor and impregnated with a highly refined insulating oil compound. The electrical conductor in paper insulated power cable is almost always made of copper. The use of copper results in a smaller diameter cable for a given voltage capacity. This is important because paper insulated power cable is normally used in underground ducts where space limitations can make the cross-sectional size of the cable important. To persons familiar with electrical cable, paper insulated power cable is easily distinguishable in appearance from other types of power cable.

The manufacture of paper insulated power cable is generally recognized in the industry as a separate segment of the insulated wire and cable business. A company's ability to manufacture paper insulated power cable is regarded as a mark of status by others in the industry. A certain amount of prestige is attached to a firm's ability to fabricate paper insulated power cable.

The National Electrical Manufacturers Association, the industry's trade association, devotes part of its statistical program to the collection and publication of separate data on paper insulated power cable. While it collects data for insulated wire and cable generally, paper insulated power cable is shown as a separate category. In 1958 and 1962–63, this trade association recommended to the Bureau of the Census that paper insulated power cable be classed as a separate product in the Census list, and in 1958 Kennecott and Okonite joined in that recommendation.

Paper insulated power cable is used to carry high voltages of electrical power. The great bulk of it is used to trunk power at high voltages underground for utility networks. In the main, paper insulated power cable has no effective competition in the area of its major use from other types of insulated power cable.

The evidence was that, in manufacturing, specialized machines are used for the production of paper insulated power cable and that without specialized paper taping machines and oil impregnating equipment a fabricating company cannot manufacture paper insulated power cable. As a result, ordinary manufacturers of insulated wire and cable cannot make paper insulated power cable because, among other things, they lack the proper machinery and equipment.

In addition to specialized equipment, the manufacture of paper insulated power cable requires special engineering technical know-how. The manufacturing skills which are necessary to produce paper insulated power cable differ from those skills necessary to produce insulated wire and cable generally.

There are distinct customers for paper insulated power cable, largely the electric utility companies. Because utilities are the principal users of paper insulated power cable, the Association of Edison Illuminating Companies promulgates the standard specifications for paper insulated power cable, whereas specifications for other types of power cable are promulgated by the Insulated Power Cable Engineers Association.

There is an identifiable group of companies in the industry engaged in the manufacture of paper insulated power cable which is much more limited than the number which makes other types of cable. The only domestic manufacturers of paper insulated power cable are: Okonite, General Cable, Anaconda Wire & Cable, Phelps Dodge Copper Products,

Simplex, American Steel & Wire Division of United States Steel Corporation, John A. Roebling's Sons Division of Colorado Fuel & Iron Corporation, Reynolds Metals and Kennecott Wire and Cable. However, only the first four companies are manufacturers of full line paper insulated power cable. Each of the four principal paper cable manufacturers—Okonite, General Cable, Phelps Dodge and Anaconda—has issued a paper cable price book. Each company sells paper insulated power cable under identical instructions and under a complex pricing formula based on such factors as the price of copper, the price of lead and the price of insulation, and each company uses the identical pricing formula.

The above examination of the "practical indicia" referred to in Brown Shoe establishes that there is no reasonable interchangeability of use between paper insulated power cable and other insulated wire and cable. Paper insulated power cable is therefore a sufficiently distinctive submarket of insulated wire and cable to be considered a line of commerce in and of itself.

II. *Is wirebar an appropriate line of commerce within which to measure the probable effects of Kennecott's acquisition of Okonite?*

Wirebar is a particular shape in which refined copper is sold. It comes in various sizes. Basically the product is the same copper that is used in other shapes. The facilities used to refine the copper are identical no matter what shape is sold. To produce the various shapes, however, molds are required. Unique molds are used to cast wirebar, but there was no indication at the trial that separate mills were necessary nor that the molds involved any substantial investment. Copper refiners sell refined copper in various shapes but the vendors of wirebar are no more and no less specialized than the vendors of refined copper generally.

Wirebar is primarily used for the production of wire. The Bureau of Mines figures show that wire mills as a group consume over 92% of all wirebar.

The evidence was that sales contracts for refined copper commonly provide only for the sale of electrolytic or fire refined copper, and do not specify any particular shape. The particular shape desired by the customer is designated by the customer after the contract is executed, and it is immaterial to the copper refiner which shape or shapes it delivers.

Refined copper is sold by the pound. There may be some variation in prices due to extra charges for casting in unusual sizes or shapes, but this variation is minimal. The price behavior of wirebar is identical to the price behavior of refined copper generally.

Since it has been stipulated that an appropriate line of commerce for the determination of this action is refined copper, the particular shape in which the copper is sold becomes somewhat immaterial. Some purchasers may want the copper in the form of wirebar; other customers may wish it in other forms. The manufacturing skills which are necessary to produce wirebar are no different from those required to produce refined copper generally. The prices of wirebar are the prices of refined copper.

Kennecott, as a copper producer, shipped its copper in various forms, of which wirebar was an important sector. Its share of wirebar shipped in the domestic market was 23.7% in 1954, 20.9% in 1955, 21.2% in 1956, 19.9% in 1957, 20.9% in 1958, 16.9% in 1959, 18.3% in 1960, 22.1% in 1961 and 19.1% in 1962.

Okonite did not produce or sell wirebar. It was a purchaser of wirebar. It purchased copper in both the form of wirebar and rods. The receipts of wirebar and rod were 1.4% of total domestic shipments in 1954, 1.4% in 1955, 1.7% in 1956 and 1.6% in 1957.

In order to measure the probable effect of Kennecott's acquisition of Okonite, the Court may take into account the purchases by Okonite of refined copper from Kennecott and the percentage thereof which is sold in the form of wirebar. There is no significant difference in the positions of Kennecott and Okonite in the

wirebar market from their positions in the refined copper market. Kennecott's shipments of wirebar are a slightly lower percentage of the industry total than are its shipments of refined copper, but Okonite's receipts are a slightly higher percentage.[2]

Since there was no competition between Kennecott and Okonite in the sale of wirebar, and in view of the foregoing facts, it seems unnecessary to consider wirebar as a separate submarket for the purposes of this action. This is not to say that under particular circumstances the form in which a product is cast may not constitute a submarket in and of itself. However, in the present situation, the market obviously was one of refined copper. This has been stipulated as a line of commerce by the parties and represents the proper factual situation.

The Court holds that wirebar is not an appropriate line of commerce, as such, within which to measure the probable effect of Kennecott's acquisition of Okonite.

■ III. *May the effect of Kennecott's acquisition of Okonite result in a substantial lessening of competition or a tendency to monopoly in any line of commerce?*

This case involves the potential lessening of competition in the horizontal aspects of the industry and also in the vertical aspects of the industry.

(a) *Horizontal Aspects of the Case*

In this aspect of the case, paper insulated power cable is the line of commerce which is particularly significant. Before the merger there were nine com-

panies which produced paper insulated power cable. Four of the nine controlled roughly 90% of the volume. The big four were: General Cable Corporation, Phelps Dodge Copper Products Corporation, The Okonite Company and Anaconda Wire & Cable Company. In the year of the merger Kennecott was the eighth largest of the nine producers in this field in the net sales of paper insulated power cable. The respective positions of the companies are shown in Government Exhibit 405.

However, a significant fact which must be taken into account is that the four big companies in the field controlled roughly 90% of the market. The percentage controlled by the four was 86.3% in 1954, 88.5% in 1955, 88.5% in 1956, 89.5% in 1957, 90.1% in 1958, 92.9% in 1959 (when KWC and Okonite merged), 89.0% in 1960, 91.6% in 1961, and 92.5% in 1962.

We have, therefore, considering the net sales of this product to domestic purchasers in the year of the merger, a merger of the Okonite Company, the third largest, with Kennecott, the eighth largest. Okonite's percentage of net sales in this line of commerce in the year of the merger was 19.6%; Kennecott's percentage of the net sales in this line of commerce in the year of the merger was 2.1%.

The language used by the Court in United States v. Aluminum Company of America, 84 S.Ct. 1283 (1964), is appropriate to this case:

"In other words, the line of commerce showed highly concentrated markets, dominated by a few com-

---

. 2. The parties have presented the Court with two alternate theories as to how to compute the total shipments of refined copper. Plaintiff contends that shipments are equal to consumption of refined copper as reported to the U.S. Bureau of Mines. Defendant contends that shipments are equal to production, less exports, plus imports, adjusted for annual inventory changes. Valid arguments have been presented upholding both sets of figures. Both methods appear to be equally accurate, and there is very

little difference between the two sets of figures. Using the arithmetic average of the two sets of figures presented by the parties, Kennecott's share of the refined copper shipped in the domestic market has been 33.0% in 1954, 28.0% in 1955, 25.4% in 1956, 23.0% in 1957, 23.0% in 1958, 17.7% in 1959, 20.9% in 1960, 22.6% in 1961 and 20.2% in 1962. The receipts of refined copper by Okonite were .76% of total domestic shipments in 1954, .80% in 1955, 1.0% in 1956, and .96% in 1957.

panies but served also by a small, though diminishing, group of independents. * * *

"The acquisition of Rome added, it is said, only 1.3% to Alcoa's control of the aluminum conductor market. But in this setting that seems to us reasonably likely to produce a substantial lessening of competition within the meaning of § 7. It is the basic premise of that law that competition will be most vital 'when there are many sellers, none of which has any significant market share.' United States v. Philadelphia National Bank, 374 U.S., at 363, 83 S.Ct., at 1741."

Under the test laid down in United States v. Aluminum Company of America, supra, it would appear that in the horizontal aspects of this case Kennecott's acquisition of Okonite may result in a substantial lessening of competition in the paper insulated power cable line of commerce.

(b) *Vertical Aspects of the Case*

Essentially, as has been stated, this case involved the acquisition by a copper producer of a copper fabricator. It is a continuation of that tendency toward integration which has existed in the copper industry and which exists in many other industries. In the vertical aspects of the case we are not concerned with competition between the two merging companies but rather what the effect would be in the industry so far as its lines of commerce are concerned. We are here dealing with the question as to what Congress meant by "competition" in Section 7 of the Clayton Act. We must look to the history of the act and the interpretation of the act for guidance. Chief Justice Warren, in Brown Shoe Co. v. United States, 370 U.S. 294 at page 344, 82 S.Ct. 1502 at page 1534, 8 L.Ed.2d 510 (1962), stated:

" * * * [W]e cannot fail to recognize Congress' desire to promote competition through the protection of viable, small, locally owned businesses. Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization. We must give effect to that decision."

Judge Learned Hand in 1945 made much the same point when he said:

"Throughout the history of these statutes [the antitrust laws] it has been constantly assumed that one of their purposes was to perpetuate and preserve, for its own sake and in spite of possible cost, an organization of industry in small units which can effectively compete with each other." United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir.) at p. 429.

Thus we are concerned not alone with the probable effects of a merger upon a particular line of commerce but also its probable effects upon the economic way of life in the industry.

"Moreover, as we have remarked above, not only must we consider the probable effects of the merger upon the economics of the particular markets affected but also we must consider its probable effects upon the economic way of life sought to be preserved by Congress." Brown Shoe Co. v. United States, 370 U.S. 294, 333, 82 S.Ct. 1502, 1528 (1962).

This Court has heretofore pointed out that:

"The natural consequence of the profit motive in a competitive society is to lead businessmen to explore the possibilities for greater profits which might be derived from an amalgamation of competitive units, with an anticipated reduction of costs, and the establishment of a position of leadership and power in an industry which will be relatively unaffected by the competitive rivalry of smaller firms. Economists have recognized that the vigor of a competitive system exerts a centripetal force which tends, for reasons of

self-interest of the parties involved, to bring about an amalgamation or union of the competitive units. Against this centripetal force the anti-trust laws have interposed a centrifugal force designed to keep the units separate and distinct and to halt the tendency toward amalgamation and union which otherwise might exist, and which, if allowed to run an unrestrained course, might result in a cartelized industrial organization which would be destructive to that individual enterprise which is regarded by most Americans as a touchstone of progress." American Crystal Sugar Co. v. Cuban-American Sugar Co. 152 F. Supp. 387, at p. 396 (S.D.N.Y.1957).

In fact, if our economic system of free enterprise is to survive, it is probably necessary for the Government to interpose itself in those situations where the natural force of economic rivalry tends toward undue concentration. Those who believe in Marxian economics, believe that the tendency toward monopoly is inevitable.[3] It is to withstand these economic pressures that Congress has enacted the antitrust laws. The economic forces which lead to amalgamation and integration of large industries are very real forces. They may indeed be desirable forces. They often lead to economic and efficient operation. It is no answer to say that such processes are desirable from an economic standpoint, for Congress has said that the tendency is undesirable from a social standpoint, and we must enforce the law as Congress wrote it and as Congress intended that it be enforced.

Competition has been defined as "the process of exchanging goods or services in a market where there is a choice of rival bids and offers." Kaplan, Big Enterprise in a Competitive System, 42 (1954). To maintain a choice of rival bids and offers it is necessary to maintain the number of effective competitors in the market.

There is no one definition of competition. Economists do not agree over the meaning of the term nor do they agree how it can be achieved. However, in the legislative debate over the 1950 amendment to Section 7, great emphasis was placed on the undesirability of the political and sociological implications of mergers and of concentration and the desirability of the preservation of small business and dispersion of economic power. Although the meaning of "competition" was not discussed, the debate suggests reliance upon a structural theory of competition which stresses the advantages of a large number of small-sized businesses.

In the course of debate the evils of undue concentration in the copper industry were repeatedly cited as examples of what the amendment was intended to stop.[4]

The problem is that a few big copper producers may buy up the available independent fabricators. Fabrication would then cease being a small business field and would be dominated by a few

---

3. See, "The Coming Struggle for Power," by John Strachey (New York, The Modern Library, 1935): " * * * No sooner has capital been accumulated to a considerable extent than the free and independent producers for the market * * * begin to 'get together.' " (At page 66). " * * * What, however, is indisputable is that the whole of American economic life is steadily coalescing and congealing into a vast conglomerate mass from which competition tends to be expelled * * *." (At p. 74).

4. E.g., 95 Cong.Rec. 11485 (1949) (remarks of Representative Celler); 95 Cong.Rec. 11489 (1949) (remarks of Representative Keating); 95 Cong.Rec. 11500 (1949) (remarks of Representative Douglas); 95 Cong.Rec. 11502 (1949) (remarks of Representative Biemiller); 96 Cong.Rec. 16436 (1950) (remarks of Senator O'Conor). See also H.R.Rep. No. 1191, 81st Cong., 1st Sess. 2 (1949) (" * * * no less than 70 percent of the long-term growth (1915–45) of the three largest companies [in the copper industry] Anaconda, Kennecott, and Phelps-Dodge, has been due to external expansion through acquisitions and mergers.")

giant corporations which produce their own copper.[5] The remaining independent fabricators would fail because they could not compete against fabricators with assured sources of supply and large amounts of capital. The small copper producers would then have no place to market their product and would fail, increasing the concentration among producers as well. This has not happened yet, but Kennecott was worried enough about the continued existence of the independents that it felt that it had to capture one for itself.[6]

Kennecott's acquisition of Okonite has in fact operated to foreclose Okonite as a customer to other copper suppliers. Okonite's copper requirements, over and above that purchased under Okonite's contractual arrangements existing at the time of the merger have been purchased from Kennecott since the merger, and it is expected that this will continue. Okonite is now obtaining virtually all of its copper requirements from Kennecott.

Okonite did not have a rod mill before the merger. It purchased its copper in the form of rod or in the form of wirebar which it had rolled into rod on a toll basis. Okonite was dissatisfied with this arrangement and was planning to build a rod mill. KWC on the other hand had a rod mill, but KWC's sale of rods to others had been limited to a few customers at low tonnages. As a result of the merger, Okonite dropped its plans for a rod mill and now the KWC mill rolls rods for the merged company.

In addition, the acquisition has added to the problems of Okonite's competitors. Since 1958, insulated wire and cable prices have been continuously falling due to overcapacity. This has been an industry-wide situation except for paper insulated power cable. Meanwhile the price of copper has remained relatively stable. Profit margins on insulated wire and cable have therefore dwindled so that many companies are now showing losses.

The integrated companies obtain the copper raw material at their cost of production, while the nonintegrated companies must pay the market price and then process the wirebar into wire and cable and sell it at a competing price with the integrated company. The integrated companies thus have an opportunity for profit in the production of the metal to justify their staying in a market in which there is a squeeze on fabrication, whereas the nonintegrated companies have no alternative opportunity for profit.

Thus the merger was primarily an advantage to Okonite rather than to Kennecott. Kennecott would have been better off in the short run selling to the independents and reaping the full profit in copper. But in the long run Kennecott feared that the independents might cease to exist. As a result of this fear Kennecott has made the problem even worse by removing an independent from the market and then competing with the remaining independents.

The Government contends that an additional evil exists on the Okonite level. The Government asserts that when copper has been in short supply, Kennecott has favored its own subsidiaries and that it will continue to do so. Evidence was received concerning the competitive situation existing during two periods of copper shortage, 1955–6 and 1959. The evidence does not support the Government's contention.

5. A similar situation in the steel drum industry was cited in debate on the floor of Congress as one case of undue concentration caused by merger activity. See 95 Cong.Rec. 11497 (1949) (remarks of Representative Boggs); 95 Cong.Rec. 11507 (1949) (remarks of Representative Byrne); 96 Cong.Rec. 16502–3 (1950) (remarks of Senator Kefauver).

6. Paradoxically competition can also be lessened through the process of competition itself. The few big copper producers may be able to achieve the same result through internal expansion. This route is not forbidden by the Clayton Act, however. Presumably Congress felt that this route was inherently more justifiable. It is also more difficult to achieve and more difficult to prevent.

During periods of shortage Kennecott has sold its copper on an allocation system based on past purchases. Kennecott allocated copper to its own fabricating subsidiaries on the same basis as to its independent customers. It was in Kennecott's self-interest to do so. If Kennecott were to discriminate against its independent customers, it would severely damage its own business. Dissatisfied customers would not return when the period of shortage had passed.

In this case there is neither any claim nor any evidence that integration between copper production and fabrication results in cost savings. The advantages of the integrated companies in this case stem from economic power, not efficiency.

Integration through fabrication in the copper industry has already proceeded to an alarming degree. Copper production is dominated by three companies, Kennecott, Anaconda, and Phelps Dodge, which together produced roughly 60% of the industry total during the period 1954–1958.[7] In 1958, the year of the merger, 25.3% of Kennecott's shipments of refined copper were to KWC and Chase; 76.8% of Phelps Dodge's shipments and 93.7% of Anaconda's shipments * * * were to their own fabricating facilities.[8] The integration had proceeded so far that any significant increase among the big three by merger is highly suspect.

Before the acquisition of Okonite, Kennecott, Phelps Dodge and Anaconda were dominant in copper production, and Kennecott was the only one of these major producers which relied upon independent fabricators for a substantial part of its copper sales. Phelps Dodge and Anaconda were expanding their fabricating capacity. Kennecott feared that the in-dependent fabricating companies would sell out to copper producers or switch into other kinds of business. Therefore Kennecott bought Okonite to preserve a market for its copper.

In short, the rationale of the acquisition was that there is no future in the copper industry for an independent insulated wire and cable fabricator, so the sooner the integrated companies become the dominant fabricators the better. The antitrust laws say otherwise, however. The fundamental purpose of Section 7 of the Clayton Act is to halt just such increasing concentration.

Kennecott's acquisition of Okonite seems likely substantially to lessen competition, or to tend to create a monopoly in both refined copper and paper insulated power cable in the United States.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and jurisdiction to try the matter charged in the complaint.

2. The following are appropriate lines of commerce within which to measure the probable effect of Kennecott's acquisition of Okonite:

(a) Insulated wire and cable

(b) Paper Insulated power cable

(c) Refined copper.

3. As to each of the lines of commerce, the United States as a whole is the appropriate section of the country within which to assess the probable effect of Kennecott's acquisition of Okonite.

4. The effect of Kennecott's acquisition of Okonite may be substantially to lessen competition in the line of commerce of paper insulated power cable in the United States in violation of Section 7 of the Clayton Act.

---

7. Figures are not available after 1958.

8. *Inspiration Consolidated Copper Co.* sent 40% of its shipments to the subsidiaries of Anaconda. Anaconda has a 28.17% interest in Inspiration. If Inspiration and Anaconda are taken as a group, 82.3% of their shipments were to their own fabricating facilities.

* * * Not all of the refined copper shipped was consumed by the subsidiaries, however. Some of the wire bar was rolled into rod and sold in that form to independent fabricators for further processing. In 1958, 36.1% of Phelps Dodge's shipments and 90.6% of Anaconda's shipments were ultimately consumed by their own fabricators.

5. The effect of Kennecott's acquisition of Okonite may be substantially to lessen competition in the line of commerce of refined copper in the United States in violation of Section 7 of the Clayton Act.

6. Kennecott's acquisition of Okonite constitutes a violation of Section 7 of the Clayton Act, as amended.

Submit decree, on notice, in accordance herewith, providing for divestiture.