**MISSISSIPPI RIVER CORPORATION,**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 19844.

United States Court of Appeals,
Eighth Circuit.

Jan. 26, 1972.

William R. McDowell, Dallas, Tex., Cleon L. Burt, T. M. Armstrong, St. Louis, Mo., for petitioner.

Frederick H. Mayer, Atty., Joseph Martin, Jr., Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Counsel, Thomas F. Howder, Atty., F. T. C., for the Federal Trade Comm.

Before VAN OOSTERHOUT, HEANEY and ROSS, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

This is a timely petition to review a Divestiture Order by the Federal Trade Commission pursuant to Section 7 of the Clayton Act, as amended, 15 U.S.C.A. § 18. The jurisdiction of this Court is provided by 15 U.S.C.A. § 21(c) and (d).

On January 22, 1965, the Federal Trade Commission (Commission) issued a complaint charging that the acquisition of the stock of Stewart Sand and Material Company (Stewart), the assets of Richter Concrete Corporation and Richter Transfer Company (Richter), and a majority interest in John A. Denie's Sons Company (Denie's) by Mississippi River Fuel Corporation (Mississippi) violated Section 7 of the Clayton Act. Mississippi, in 1965, changed its name to Mississippi River Corporation. On January 29, 1968, a Hearing Examiner concluded that Complaint Counsel had not proven a violation and the complaint should be dismissed. On appeal the Commission on May 20, 1969, vacated the order of the Examiner and ordered divestiture. The appeal to this Court followed.

Mississippi bases this appeal on five main contentions:

I. The Commission's order is contra to the purposes of the Clayton Act.

II. Mississippi's entry into the cement industry is procompetitive rather than anticompetitive.

III. The conclusion of the Commission is not based on substantial evidence.

IV. The Commission lacked jurisdiction over Richter.

V. Mississippi's Vice President was denied his right to counsel and due process of law in violation of the Administrative Procedure Act and the Fifth Amendment by a Hearing Examiner's ruling.

We affirm the order of the Federal Trade Commission for the reasons hereinafter set out.

### BASIC FACTS.

*Mississippi.* The acquiring company, organized in 1928, is incorporated and exists under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri. Mississippi is new to the cement industry. Until Mississippi decided to diversify, the company and its subsidiaries were primarily engaged in the exploration, production, transportation, and sale of natural gas and oil, and in the operation of the Missouri Pacific Railroad. In 1963 (the year the acquisitions were authorized by Misisippi's Board) Misissippi had total assets of $151.9 million, revenues of $72.3 million, and net income of $9.06 million. By 1966 Mississippi's total assets equaled $190.8 million, revenue equaled $107.95 million and net income equaled $10.1 million. The total earnings figures do not include those of the Missouri Pacific Railroad except to the extent of dividends received by Mis-

sissippi on its stock in the Railroad. In 1950 Mississippi bought a tract of land (the Selma tract) consisting of 4,500 acres along the Missouri River located at Festus, Missouri. About 1,000 acres of the tract were utilized for the construction of a nitrate plant which later was sold to a fertilizer company. The remaining 3,500 acres contained valuable deposits of limestone and silica sand. Mississippi later decided to use this tract for the production of portland cement, the main ingredient in the production of ready-mixed cement. The effect of this decision will be dealt with later in this opinion.

*Stewart.* This acquired company is a corporation organized and existing under the laws of Missouri principally based at Kansas City, Missouri. At the time of the acquisition Stewart was principally engaged in the production and sale of ready-mixed concrete and mineral aggregates in the States of Missouri and Kansas. For 1962 Stewart had net sales of $6.87 million and net (after tax) profits of $275,540. Prior to the acquisition Stewart was the largest purchaser of portland cement and the largest producer of ready-mixed concrete in the Kansas City area.

*Denie's.* This acquisition is a corporation organized and existing under the laws of the State of Tennessee with its principal office located in Memphis, Tennessee. Denie's was engaged in the production and sale of ready-mixed concrete and other allied businesses. For 1962 Denie's had a total income of $7.24 million, net income (before Federal Income taxes) of $308,756.00 and assets of $4.-59 million. Prior to September 1963 Denie's was one of the two largest purchasers of portland cement and manufacturers of ready-mixed concrete in the Memphis area.

*Richter.* This vertical acquisition also involves a series of horizontal acquisitions. In 1964 Stewart organized a corporation by the name of Richter (Richter '64) under the laws of Ohio with principal offices in Cincinnati, Ohio. Richter '64 then acquired all the assets of Richter Concrete Corporation, an Ohio corporation formed in 1933 (Richter '33), and trucks and vehicles formerly owned by Richter Transfer Company, another Ohio corporation. Richter '33 was principally engaged in the production and sale of ready-mixed concrete and Richter Transfer Company in the hauling business. Richter '33 and Richter Transfer were owned and operated as family owned businesses under a common direction and control with essentially the same personnel. For present purposes it is not necessary to distinguish the three companies and "Richter" will be used to refer to the entire business enterprise. Richter is a wholly owned subsidiary of Stewart. Prior to the 1964 acquisitions, Richter was the largest purchaser of portland cement and the largest producer of ready-mixed concrete in the Cincinnati area.

*Background of Acquisitions.* In 1959 Mississippi began investigating development of the 3,500 acre tract previously referred to for the production of portland cement. Attempts were made to engage in a joint venture with an already established portland cement company. When those attempts failed, Mississippi embarked upon a program of developing a facility of its own. Mississippi on the basis of surveys in 1961 and 1962 concluded that the best outlets for its product would be the St. Louis and Kansas City, Missouri, Memphis, Tennessee, and Cincinnati, Ohio, markets. It was felt by Mississippi's board that these markets were so rigidly controlled by "covert" methods of tying customers that captive outlets were essential for entry. Further investigations made by Mississippi in early 1963 served to reinforce that conclusion. Simultaneous with the award of the contract for engineering and planning the design of the portland cement plant, Mississippi's board approved the acquisitions of Stewart and Denie's. These acquisitions were made in late 1963. In January of 1964 the Richter arrangements were made. When all the acquisitions were completed, the first

contracts for the construction of the cement plant were awarded. The plant began operation in 1965.

## I.

The first issue raised by Mississippi takes issue more with the application of Section 7 than with the findings of fact of both the Examiner and the Commission. Mississippi contends that since it is a relatively small company its attempt to add to the economic growth of St. Louis, Missouri, by adding a new entity to the cement industry through internal expansion and acquisitions does not fall within the scope of Section 7. This contention raises the issue of the scope of Section 7.

Section 7, as amended, was intended to "arrest in their incipiency restraints * * * in a relevant market." United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057. As the Supreme Court said of vertical integrations in Brown Shoe Co. v. United States, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510:

> "[T]he arrangement may act as a 'clog on competition,' Standard Oil Co. of California [and Standard Stations] v. United States, 337 U.S. 293, 314, [69 S.Ct. 1051, 1062, 93 L.Ed. 1371], which 'deprive[s] * * * rivals of a fair opportunity to compete.' H.R.Rep.No. 1191, 81st Cong., 1st Sess."

■ It is further recognized that not all vertical mergers violate the Act. Section 7 proscribes vertical acquisitions whose effect "may be substantially to lessen competition in any line of commerce in any section of the country." To find a violation of the Act an acquisition is to be examined as to its adverse effect on competition.

■ Both the Examiner and the Commission found that Mississippi's entry into the cement market was not achieved by internal expansion. We find substantial evidence in the record to support that finding. An internal expansion presupposes a company doing business in one of the markets and then expanding inter-

nally either forward or backward into the other market. Mississippi relies greatly on the fact that the cement plant went on stream subsequent to the purchase of the ready-mixed companies. Therefore, Mississippi contends that this situation involves an established ready-mixed chain building its own cement plant. The record clearly supports the finding that the acquisitions were part of an overall plan. Mississippi's President testified that they would not have entered the markets without the assurance of a captive buyer for the product. The decision to produce portland cement did not arise out of the established ready-mixed business, but was conceived before entering the ready-mixed business. This is a case of an established corporation entering two markets in essentially one series of transactions utilizing the device of vertical acquisition. Each transaction was dependent upon the other to effect entry into the market. If the acquisitions meet the criteria discussed in Part III of this opinion, the transactions are violative of the Act.

■ While Mississippi may be unranked financially, it has proven by these acquisitions that it is not incapable of marshalling enormous capital with which it may likely obtain a high rank in the cement industry as well as in total financial strength. While the size of the acquiring company may be an element of the competitive impact of an acquisition, the Act does not exempt from its scope transactions by companies which may be considered small. Nor does the Act exempt new entrants in a market or markets from its scope. Again, the fact that a new entity has been created may be relevant in assessing the competitive effect of an acquisition, but it is only one factor to be weighed by the Commission.

■ Mississippi makes much under each issue of the contention that the cement market is so oligopolistic that the market could not be entered in any other way. In the context of the scope issue Mississippi argues that finding a violation of the Act in this situation serves to insulate an entrenched oligopoly, which

is counteractive of the intent of Section 7. The structure of the markets would not exempt Mississippi from the scope of Section 7. The Act is intended to abort concentration, not ignore possible increases in concentration because the market may already be oligopolistic.

## II.

Mississippi contends that the cement markets in Kansas City, Memphis and Cincinnati were so saturated with covert de facto integration that its entry is pro-competitive to counteract that integration. Mississippi offers the contention as a defense to an alleged Section 7 violation.

■■ While an acquisition is to be measured functionally within the market structure of the particular market, United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533; Brown Shoe Co. v. United States, supra, 370 U.S. at 321–322, 82 S.Ct. 1502, the anticompetitive effects of an acquisition in one market cannot be justified by pro-competitive effects in another market. Honest intentions, business purposes and economic benefits are not a defense to violations of an antimerger law. United States v. E. I. DuPont De Nemours & Co., supra, 353 U.S. at 607, 77 S.Ct. 872; United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915.

■ At this point it is not necessary to comment fully on the factual findings concerning the structure of the markets. The Commission did find, however, that Mississippi could have entered the markets short of complete acquisition. The distinction between the alleged covert tying methods alleged by Mississippi and outright acquisition lies in the permanency of the relationship. The short term effects of loans to ready-mixed companies by portland cement producers are more competitive than the effects of merging.

## III.

■ Mississippi's contention that the Commission's determination and or-der are not supported by substantial evidence lacks merit. The fact that the Hearing Examiner reached a result contrary to that of the Commission does not deprive the Commission of its right to make fact findings which are supported by substantial evidence on the record as a whole. As pointed out in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, the duty of the appellate court is to determine the substantiality of the evidence to support the Commission's findings on the basis of the record as a whole. The findings of the Trial Examiner constitute part of such record. *Universal Camera* thus states the ruling:

"We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. . . ." 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456.

■ The Commission points out in its decision and order that it is in agreement with the Examiner's detailed findings of fact. The Commission in its opinion filed May 20, 1969, determines that its difference with the Examiner arises out of the application of Section 7 standards to the facts of the case. The Commission also points out in detail in its opinion the evidence it relies upon in finding the violations. We are satisfied that the Commission's order is supported

by substantial evidence on the basis of the record as a whole.

■ The substantiality of the evidence upon which the divestiture order is based is to be measured according to the relevant product and geographic markets and to the structure of the industry in the markets involved. Brown Shoe Co. v. United States, supra; United States v. Columbia Steel Co., supra.

PRODUCT MARKETS: The Commission found that portland cement and ready-mixed concrete are the relevant product markets in this situation. Portland cement is the main ingredient to which water is added to make concrete. There is no practical substitute for portland cement. Ready-mixed concrete is concrete delivered to a consumer in an unhardened state. Companies in the ready-mixed business are the nation's principal users of portland cement. Petitioners do not contest the Commission's findings.

■ GEOGRAPHIC MARKETS: The Commission found that the metropolitan areas of Kansas City, Cincinnati and Memphis comprise the relevant areas in which to measure the competitive effect of the acquisitions. Those areas are defined according to the "Standard Metropolitan Statistical Areas" devised by the Bureau of the Budget. Relevant geographic markets are not "susceptible to a precise metes and bounds definition." The relevant market is determined according to the area in which the seller competes. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 331, 81 S.Ct. 623, 5 L.Ed.2d 580. Within the broad general areas, well defined sub-markets may exist which constitute geographic markets for antitrust purposes. See Brown Shoe, supra, 370 U.S. at 325, 82 S.Ct. 1502. Petitioners do not challenge the Commission's findings for the ready-mixed market, contending mainly that the findings are incorrect as to the portland cement market. However, Mississippi did conduct its own surveys using the designated areas to decide whether or not to enter the cement

industry. The use of metropolitan areas in the cement industry was accepted by the Sixth Circuit in United States Steel Corp. v. F. T. C., 426 F.2d 592, 596. We are persuaded to follow the designation adopted by that court.

STRUCTURE OF THE CEMENT INDUSTRY IN THE RELEVANT MARKETS: The Commission found and the parties do not contest the fact that the three delineated markets were the subject of concentration. In 1963 the Kansas City market was served by nine portland cement suppliers. Two firms accounted for 53% of all shipments of cement into the area and the top four firms accounted for 81%. Fifteen ready-mixed companies operated in the area with Stewart's consuming 31.3% of the cement shipped to ready-mixed companies and 23.5% of all cement shipped to the area. Stewart's sales of ready-mixed concrete totaled 30.4% of the concrete sold in the Kansas City market. Stewart's sales more than doubled that of the second largest concrete firm.

Seven cement producers served the Memphis area in 1963. The top two firms accounted for 79% of the sales and the top four firms accounted for 96%. The twelve ready-mixed companies bought over 60% of the portland cement sold in the area. Denie's accounted for 29% of the purchases for ready-mix production and 20% of the total portland cement purchases. Denie's accounted for 27% of the ready-mixed concrete sales. The top four ready-mixed companies accounted for over 78% of the sales.

The Cincinnati area consists of twenty-three ready-mixed companies served by nine cement companies. The top three portland cement purchasers account for 52% of the total sales and the top four account for 66%. Richter bought 37% of the cement sold to ready-mixed companies and 24% of the total cement sold. Richter sold 33.5% of the ready-mixed concrete in the area and the second top seller combined with Richter to total 54%.

■ THE ANTICOMPETITIVE EFFECT: The United States Supreme Court has looked to several functional factors as indicia of the competitive effect of vertical mergers. The factors include: (1) foreclosure of the competitors at either level from a segment of the market; (2) the purpose of the merger; (3) likely adverse effects on local business; (4) the trend toward concentration; (5) the trend toward vertical integration; and (6) the barriers to entry by new firms. F. T. C. v. Consolidated Foods, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95; United States v. Kennecott Copper Corp., 231 F.Supp. 95 (SDNY) aff'd per curiam, 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692; Brown Shoe Co. v. United States, supra; United States Steel Corporation v. F. T. C., supra. The Commission found anticompetitive effects in each of the factors and we are satisfied that the conclusions of the Commission are based upon substantial evidence.

■ FORECLOSURE. By these acquisitions Mississippi was able to foreclose a substantial portion of the portland cement market in the area of each acquisition. The primary vice of a vertical acquisition is the tying of a customer to a supplier on a permanent basis. United States Steel Corporation v. F. T. C., supra, 426 F.2d at 599. Mississippi was able to insure sales of portland cement to at least 23.5% of the Kansas City market, at least 20% of the Memphis market, and at least 24% of the Cincinnati market. Even though there is some testimony from some portland cement companies serving the area that they were not effected by the arrangement, there is substantial basis in fact for the Commission's findings. Many cement companies showed concern over the acquisitions and the record shows increased attempts of other companies to guarantee a market.

Mississippi contends that the Commission erred in using the standard metropolitan statistical areas established by the Bureau of the Budget as the relevant geographical areas. The Trial Examiner, at findings 71 to 75, conceded that some modified variation from such standards might be justifiable in determining the relevant geographical area but determined:

"The inconsistencies and anomalies disclosed by the record, which result from the fact that the defined areas do not precisely describe the whole areas and the only areas of possible competitive impact, however, are not of such magnitude as materially to impair their validity as appropriate areas for consideration in this proceeding. And the availability of alternative concepts of market area definitions does not render improper the concept which was adopted."

We agree. See United States Steel Corporation v. F. T. C., supra, p. 596 of 426 F.2d.

Mississippi contends that if the lines of the geographic markets were properly drawn their market control would be 3.7% for Stewart, 1.3% for Denie's and 1.3% for Richter. The record affords no basis for enlarging the geographical area to such an extent as to reduce the market control to the percentages claimed by Mississippi.

The Court in United States Steel Corporation v. F. T. C., supra, found that the merger there in question foreclosed 1.8%, 2.1% and 1.7% of the northeast United States market for the years 1962–64. Based on Brown Shoe Co. v. United States, supra, where the foreclosure was as low as 1.5%, the Sixth Circuit found the foreclosure to be well within the prohibited zone. We, likewise, find the foreclosure by Mississippi to fall into the prohibited zone even if the wider market lines were to be drawn. Under Section 7, as amended, the Commission has only to find a *probability* of lessening of competition. Brown Shoe Co. v. United States, supra, 370 U.S. at 323, 82 S.Ct. 1502, 8 L.Ed.2d 510; F. T. C. v. Procter & Gamble Co., 386 U.S. 568, 577, 87 S.Ct. 1224, 18 L.Ed.2d 303. That finding is supported by the record.

■ PURPOSE. In examining an alleged Section 7 violation, examination of the nature and purposes of the acquisition is relevant. Brown Shoe Co. v. United States, supra, 370 U.S. at 329, 82 S.Ct. 1502. There is no question in this situation that the purpose of the acquisition is to insure that Mississippi would have a captive market with no competition for a large share in each market.

Mississippi contends that the purpose of the acquisitions was to enable it to enter an otherwise closed market. There is substantial evidence to show that Mississippi could have entered the markets with measures short of acquisition. There is no evidence that Mississippi attempted to sell competitively or made an attempt to contract for sales before acquiring the ready-mixed companies. Even if we *assume* that Mississippi could have entered in no other way, the anti-competitive effects of the entry show a violation of Section 7, as amended. The antitrust laws do not excuse further concentration because a market is already concentrated. Mississippi contends throughout that by establishing a new competitive entity they have increased competition. However, the challenged establishment, in reality, removes over 25% of the markets from competition before adding to the competition for the remaining 75% of the market.

EFFECT ON LOCAL BUSINESS. The adverse effect of the acquisitions was immediately felt by other companies. United States Steel was forced to close a Cincinnati terminal in 1967 after three years of operation because of the loss of Richter's business. The record also shows that a series of vertical mergers followed Mississippi's actions. Mississippi was effectively able to control a large portion of each market without fear of competition. Mississippi's action then left approximately 75% of the market open to competition. Eliminating a large portion of the market in this manner has the effect of squeezing the remaining firms.

TREND TOWARD CONCENTRATION. The finding by the Commission that there is a trend toward concentration in the designated markets as well as in the industry as a whole is not contested, and is relied upon by Mississippi in its defense. The percentages of concentration previously referred to in these markets have been held to be unduly high in previous antitrust cases. United States v. Philadelphia National Bank, supra, 374 U.S. at 363–366, 83 S.Ct. 1715, 10 L.Ed.2d 915; United States v. Aluminum Company of America, 377 U.S. 271, 278–279, 84 S.Ct. 1283, 12 L.Ed.2d 314. Mississippi's acquisitions serve to intensify that concentration making its elimination an even more difficult task.

■ TREND TOWARD INTEGRATION. The Commission found a trend toward vertical ties in the industry in the relevant markets as well as in the nation as a whole.[1] That finding is based on substantial evidence. See United States Steel Corporation v. F. T. C., supra. One of the purposes of Section 7, as amended, is to reverse trends toward vertical integrations. The United States Supreme Court has stated: "[R]emaining vigor cannot immunize a merger if the trend in that industry is toward oligopoly [or vertical integration]." 370 U.S., at 333, 82 S.Ct., at 1528.

BARRIERS TO ENTRY. Barriers to entry in a market strengthen the market power of existing firms allowing the use of oligopolistic power with relative safety from new competition. Any new barriers make a strong market position even stronger. F. T. C. v. Procter & Gamble Co., supra, 386 U.S. at 578–581, 87 S.Ct. 1224; United States v. Penn-Olin Chemical Co., 378 U.S. 158, 173–174, 84 S.Ct. 1710, 12 L.Ed.2d 775. The Commission found that the challenged mergers constitute a substantial new barrier to entry in an industry already characterized as having substantial barriers. Testimony of Mississippi's Vice President characterized the cement in-

1. See F.T.C. Staff Report, 1966, Economic Report on Mergers & Vertical Integration in the Cement Industry.

dustry as one requiring large amounts of capital to enter. Mississippi further felt that barriers to entry were so high already that merger was the only way to enter. The business of the acquired companies is now foreclosed to new entrants on top of the previously existing barriers. Mississippi contends that its merger activity did not raise the barriers to entry. However, the formidable barriers Mississippi found (none of which were vertical mergers then) are enlarged by Mississippi's action of eliminating a large portion of the market from any possibility of competition from a new entrant.

## IV.

■ Both the Hearing Examiner and the Commission found that the Commission had jurisdiction over Richter on the basis that Richter, as the acquired company, was engaged in interstate commerce.

In 1963 Richter sold and delivered 121 cubic yards of ready-mixed concrete from Ohio into Kentucky. Being notified that it did not have a license to sell concrete in Kentucky, Richter then delivered approximately 4,000 cubic yards of concrete to the contractor who accepted delivery in Ohio and then transported it to Kentucky.

The record shows that Richter regularly purchased materials in interstate commerce. We do not find that changing the character of portland cement by adding water and delivering it in an unhardened state causes the product to lose its interstate character. See Foremost Dairies, Inc. v. F. T. C., 5 Cir., 348 F.2d 674.

## V.

Five U.S.C.A. § 555(b) provides: "a person compelled to appear in person before an agency . . . is entitled to be accompanied, represented, and advised by counsel. . . ." Mr. Manley, Vice President of Mississippi River Corporation and President of the cement subsidiaries, was subpoenaed to testify by the complaint counsel. Upon completion of direct examination a short recess was called. Mr. Manley was then told by the Examiner that he could not confer, either during recess or lunch, with counsel for respondent about his testimony. Mississippi contends that the ruling violates the Statute and taints the whole proceeding to such a degree that this Court should remand the entire case. The Commission upheld the Examiner's ruling on the basis that no unfairness had been shown. We agree.

■ Neither Mr. Manley nor respondent's counsel advised the Examiner that counsel for Mississippi represented Mr. Manley. The Statute relied upon appears to be designed for the protection of the witnesses, not for the benefit of the litigants. In any event, Mississippi has failed to demonstrate that it has been prejudiced by the ruling. See 5 U.S.C.A. § 706; see also United States v. Bensinger Co., 8 Cir., 430 F.2d 584, 591–592. Some thirty days after the incident above referred to, Mississippi produced Mr. Manley as a witness and had a full opportunity to present additional testimony of the witness.

Mississippi in its reply brief for the first time raises the issue that the Commission in the subsequent case of Lehigh Portland Cement Company, FTC Docket No. 8680, allowed a respondent a more liberal discovery than is allowed Mississippi. The Commission's order was vacated with remand to the Commission in F. T. C. v. Crowther, 139 U.S.App.D.C. 137, 430 F.2d 510. On remand, the F.T. C. on July 31, 1970, in substance reinstated the Mississippi procedure.

■ Proper judicial administration requires that error relied upon should be asserted in appellant's opening brief. See Rule 28(a), FRAP. New issues cannot ordinarily be raised by reply brief. See Smith v. American Guild of Variety Artists, 8 Cir., 368 F.2d 511, 514, and cases there cited. In any event, we find the contention to be without merit. Mississippi has not demonstrated that it

was in any way prejudiced by the ruling of which it now complains.

A review of the entire record satisfies us that Mississippi has had a fair hearing before the Trial Examiner and the Commission and that the Commission has applied proper legal standards, and that its order is supported by substantial evidence.

The decision and order of the Commission is affirmed and enforced.