**MISSOURI PORTLAND CEMENT COMPANY, Plaintiff,**

v.

**CARGILL, INCORPORATED and the First Boston Corporation, Defendants.**

No. 73 Civ. 5464.

United States District Court, S. D. New York.

April 15, 1974.

Davis Polk & Wardwell, New York City, for plaintiff; Daniel F. Kolb, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant Cargill, Inc.; John W. Castles, III, Gordon B. Spivack, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant The First Boston Corp.; John F. Arning, New York City, of counsel.

## OPINION

STEWART, District Judge:

*Background.*

Federal courts have become a common arena in which tender offer battles are waged. The action before this Court be-

gan with an order to show cause why Cargill, Incorporated (Cargill) should not be restrained from continuing its cash tender offer to purchase all outstanding shares of Missouri Portland Cement Company (Missouri Portland). The action and counter-action arise under Sections 9, 10(b), 13, 14(d) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i, 78j(b), 78m, 78n(d) and 78n(e), and under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4, 7 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 18 and 26. This Court has jurisdiction over the action under 15 U.S.C. §§ 26, 78aa.

Plaintiff Missouri Portland is a corporation organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri. Defendant Cargill is a closely held corporation organized under the laws of the State of Delaware with its principal place of business in Minneapolis, Minnesota.

After a hearing on an application by Missouri Portland for a temporary restraining order on Friday, December 28, 1973, this Court denied Missouri Portland's application on the same day and also granted an order for expeditious discovery. The following Wednesday, January 2, 1974, hearings began on Missouri Portland's application for a preliminary injunction against Cargill's tender offer to which was joined Cargill's claim that Missouri Portland had violated the Securities Exchange Act of 1934 and for appropriate relief. Missouri Portland's first claim is that Cargill violated the securities laws by misrepresenting and omitting material facts in its tender offer statements. The second claim against Cargill is based on the allegation that Cargill's takeover of Missouri Portland would constitute a violation of the antitrust laws. While the hearings for a preliminary injunction were proceeding, Cargill applied to the Court for an order requiring Missouri Portland to stop communicating with its shareholders, to correct misrepresentations, and to turn over its shareholder list to Cargill. The orders of January 7 and 14, 1974, granted Missouri Portland's application for a preliminary injunction on the basis of the antitrust allegations and generally preserved the status quo pending appeal.[1]

The first part of this opinion is limited to a determination of the antitrust allegations.

## I  Antitrust Allegations

*Facts. The Portland Cement Industry.*

Missouri Portland's principal business is the production of portland cement, a binding agent used in a mixture to produce concrete. The manufacturing of this dark gray fungible powder is only the first and relatively inexpensive stage in the cement business. While the manufacturing process for portland cement is well known and quite simple, the capital outlays to enter the industry are substantial, e. g., the cost of constructing a cement plant. A company planning to enter the cement business would have to have substantial resources and staying power.

The heavy bulk commodity is generally sold to ready mix concrete dealers and in some cases directly to building contractors. The cost of transporting the cement is the major expense involved in the production and distribution of the product. Ready mix dealers do not have storage facilities for cement so their needs require prompt delivery on short notice. The portland cement industry is thus characterized by substantial capital investment for the construction of plants and by the need for prompt transportation of the cement to ready mix dealers in the surrounding areas. This Court notes that Cargill's general pricing policy conforms to the structure of the cement business: to cut costs, operate on

---

1. This Court ordered Cargill to refrain from any action taken for the purpose of acquiring stock in Missorui Portland. We restrained Missouri Portland from making any material changes in its business and required both parties to serve proposed drafts of advertisements and communications on each other and required that all parties must consent to the drafts or apply for leave of this Court.

a very low margin and rely on high volume to earn profits.

*Missouri Portland.*

Missouri Portland has three plants from which it distributes cement. They are located in St. Louis, Missouri, on the Mississippi River; Independence (Kansas City), Missouri, on the Missouri River; and Joppa, Illinois, on the Ohio River. Its plants are located on rivers so that the cement may be barged in bulk to its eight terminals located in Memphis, Tenn., Decatur, Ala., Nashville, Tenn., Owensboro, Ky., Louisville, Ky., Omaha, Neb., Peoria, Ill. and Chicago, Ill. Most of Missouri Portland's cement is transported by truck from these plants and terminals. Because of a zone pricing system used in the trucking business cement is generally not transported over 200 miles from the plant or terminal. As a result, ready mix dealers rarely order cement from suppliers who do not have terminals or plants nearby. Although Missouri Portland operates in 11 Midwestern states it has demonstrated that its principal marketing areas are generally located within a radius of 200 miles of its plants or terminals. The underlying business factors (cost and promptness of transportation) support the contention that Missouri Portland's prime market areas are centralized around its plants and terminals. Defendant urges us to find that Missouri Portland services 11 states. We so find, but we also find that the testimony and record before this Court reflect that the serviced areas with which we are concerned are tightly concentrated around Missouri's plants and terminals. To find otherwise would be to ignore economic realities. Based upon these business realities this Court finds that the metropolitan areas which Missouri Portland services are the relevant market areas for a determination of the antitrust issues.

*Portland Cement Market.*

While defendant urges this Court to address itself to the general 11 state area and to the capacity of the companies in those states, we find that Missouri Portland's markets and submarkets in which competition will be adversely affected are, more particularly, metropolitan areas. Production capacities, while they are interesting, do not alone reflect actual market conditions, nor can they be used to infer the relative market positions of portland cement producers in specific metropolitan areas.

The metropolitan centers in the eleven Midwestern states served by Missouri Portland have different definable characteristics which make them distinguishable submarkets. Prices may differ from one market to another depending on the competitors present. Different markets are served by different companies. Missouri Portland has one set of competitors in Kansas City, another set in St. Louis, another in Memphis, and so on.

The seven major metropolitan marketing areas served by Missouri Portland are highly concentrated markets. Missouri Portland ranks first and accounts for 28% of the cement shipments in the St. Louis, Missouri marketing area. Ninety percent of the cement shipments are accounted for by the top four companies. In the Kansas City area Missouri Portland ranks first and accounts for 30% of the cement shipment. In this market area the top four companies account for 89% of the market. Missouri Portland ranks first in the Memphis, Tennessee metropolitan area with 30% of the market. The top three companies in this area account for approximately 100% of the cement shipments. In the Omaha, Nebraska area the top four companies account for 98% of the cement shipments. Missouri Portland accounts for 21% and ranks second in this area. Each of these metropolitan areas is a relevant market for determining whether there will be a substantial lessening of competition by a takeover of Missouri Portland by Cargill.

There is nothing in the record to reflect that the dominance of Missouri Portland in the relevant metropolitan cement markets is diminished by the existence of theoretically stronger companies in the same areas which have chosen not

to produce at full capacity or not to expand their cement divisions with their extensive capital resources.

The cement industry is aptly described as capital intensive, a factor affecting market conditions. There is a trend toward larger production facilities increasing the already substantial amount of capital necessary to build production plants. This is reflected by the fact that since 1950 entry into the industry has tended to be by large companies, either foreign cement companies or large diversified American companies. The increase in capacity has been principally made by large cement producers or by cement companies owned by large well-financed companies. The lack of capital has caused smaller plants to close down. This trend has continued to make the cement industry more highly concentrated. Difficulty of entry into this capital intensive industry is demonstrated by the estimation that it would cost $200 million to reproduce Missouri Portland's present cement facilities.

*Cargill's Position.*

A. Cargill is a huge privately held company with substantial diversification in bulk commodity markets. Cargill had net sales of $5.3 billion and a net income of $107.8 million for fiscal year ending May 31, 1973. Its net worth as of May 31, 1973 was $352.4 million. Cargill's *continuing growth is reflected by the* fact that on November 30, 1973 its sales were ahead of a comparable period for the prior fiscal year by $1.6 billion.

Cargill has been principally engaged in grain trading since 1865. Cargill's chief executive officer has aptly described the grain business as a commodities type business. It involves the sale of goods and shipment in bulk. Since 1932 Cargill, through a subsidiary, has engaged in the operation of river barges which carry bulk commodity products and of tow boats which push the barges. By owning its own barges and tow boats Cargill has a competitive advantage in the transportation of grain and other commodity products because its service can be more prompt and less expensive than if it had to rely on transportation facilities of another company. By having its own barges Cargill can carry bulk commodities to a customer and then return with another commodity. Cargill's capacity for transporting bulk commodities makes diversification into commodity businesses other than grain both economically feasible and advantageous. In fact, since 1940 Cargill's expansion has been directed towards businesses involving bulk commodities. Transportation is one of the principal economic factors in any bulk commodities business, and as discussed above, this fact is especially true of portland cement.

Since 1940 Cargill has been engaged in the vegetable oil processing (soybeans) and animal feeds businesses. These products are fungible products, like grain, which are shipped in bulk. In entering these businesses Cargill began by acquiring small plants and then greatly expanding the business. Cargill's chief executive since 1960, Mr. Kelm, asserts that Cargill always endeavors to become a significant factor in any business it enters. Approximately eighty percent of Cargill's business in 1960 was in grain trading and vegetable oil processing. Cargill has developed considerable expertise in the production, marketing and distribution of bulk commodities. The commodities business requires skill in negotiation of price with sophisticated industrial users, an ability to control and limit excessive transportation costs and an ability to provide service that is expected by usual industrial customers. These skills are substantially transferable from one commodity to another. In this area Cargill has salesmen who know how to sell fungible products and have been transferred by Cargill from the sale of one bulk commodity to another. Cargill has also developed the ability to transport heavy bulk products profitably, promptly and reliably. Because Cargill is a large shipper it is given preferential treatment by railroads and other shippers. Railroads and other shippers respond quickly to service requests by Cargill.

Being an immense company with prompt access to transportation services of its own as well as of others places Cargill in an ideal position to exploit these abilities by expanding its business into different bulk products.

Since 1960 Cargill's diversification has accelerated for two significant reasons: (1) Cargill wanted opportunities to reinvest its capital at a return that was greater than in grain and soybean, and (2) diversification promised to provide more stable earnings because the grain business was "dramatically cyclical." Cargill's diversification plans begin at the department levels where determinations to go into a particular product could be based on daily business factors. A Long Range Planning Committee of the Board aids Cargill's chief executive in studying various areas of possible diversification. The record reflects that since 1960 Cargill has diversified into several bulk commodity businesses. Its entry into other businesses was accomplished by acquisition of either a small or medium sized company or plant or by de novo entry in a business. After entering the area Cargill significantly expands production, and sales by substantial expenditures.

Cargill has entered one bulk commodities business after another in which its skills and facilities have enabled it to become a dominant factor in the market. In the 1960s Cargill entered the sugar trading business. Because sugar is a fungible bulk commodity Cargill eased into the business by hiring a man experienced in the field who then trained employees of Cargill to run the sugar business on their own. Also, in the 1960s Cargill purchased a long established medium sized ores and metals company for $6,000,000. Again these fungible products involved many of the same business skills as used in Cargill's other businesses. Cargill's subsequent purchase of a steel distributing company expanded its ores and metals business. Cargill also entered the fertilizer business in the 1960s by establishing mixing plants in strategic country locations, building warehouses and by using its personnel from other similar bulk commodities products to run its fertilizer business.

Cargill entered de novo into the business of international shipping of commodities and now has ocean-going vessels built for shipping bulk commodities. This expansion cost approximately $54 million and required the difficult task of hiring expert personnel and trained seamen.

A classic example of Cargill's ability to enter related bulk commodities businesses was its entry into the flour milling and corn wet milling businesses. After acquiring a small company in each business, Cargill expanded the businesses substantially. It expanded a small corn wet milling plant at a cost of $6.8 million and then built a second plant for approximately $45 million.

The chemical division of Cargill has expanded into the manufacture of man-made resins and polyurethanes, which are shipped in bulk by train or truck. The poultry products business attracted Cargill in the early 1960s and it acquired small plants in Arkansas, Florida and Delaware. It has since expanded these plants. Because transportation is a significant aspect of this business, Cargill's best skills and assets were employed in the poultry business also.

The salt business was also entered by Cargill in the 1960s. In its general fashion, Cargill entered the business through a rather small operation and thereafter expanded. By entering the salt business Cargill now possesses an additional business skill in mining. Entry into the portland cement business has now been termed "very logical" by Cargill.

*Cargill's Decision to Enter the Portland Cement Industry.*

In August of 1972 the Salt Department established a Salt Expansion and Diversification Group (Salt Group) to investigate priorities and expansion opportunities. The Salt Group met on August 4, 1972 and decided that expansion into a related industry should only be considered if the industry was similar to

salt with respect to two of the department's skills in production, marketing and distribution. After researching such industries as coal, cement, lime, chlorine, kaolin, aggregates, zinc, flourspar, asphalt, potash, phosphate and caustic soda, and studying preliminary reports, at a meeting on October 24, 1972, the Salt Group rated the cement industry as the number one acquisition prospect.[2] Mr. Leisz who had been researching the cement industry was assigned to expand the investigation and to gather financial information about cement companies. Cargill determined from independent research and from professional assistance from outside consultants that there was similarity between the cement industry and the milling industry. The consultant's report, An Overview of the Cement Industry, discussed the regional markets in the cement industry, the concentrated and concentrating nature of the markets and the cost factors involved in constructing a new cement plant. After considering reports and studies the Salt Group met on December 26, 1972 and agreed that the cement industry was the primary prospect for diversification.

Cargill's firm determination to enter the cement business is further evidenced by steps taken in 1973 beginning in February when Cargill retained Robert Morrison, former President of Marquette Cement Company, to assist in selection of a cement company. It is significant to note that in setting forth Cargill's intentions to Mr. Morrison, Mr. Leisz (the cement man of the Salt Group) stated that Cargill desired an acquisition that "would allow Cargill to become the tenth largest cement company in ten years, the fifth largest in fifteen years and the largest in twenty years." This desire relates to the country as a whole but it is relevant to show what Cargill's anticipated market position will be regarding the pertinent market areas in the present lawsuit.[2a]

Having received reports on various companies by Mr. Morrison, on March 26, Mr. Leisz submitted his final report which amplified his previous conclusions and specified the following similarities between the salt and cement industries: both products are primarily bulk; products move either directly from production or through terminals to customers; the Interstate Commerce Commission regulates these commodities; trucking accounts for over 80% of product deliveries to customers; the season for cement usage is opposite from that of salt; users have small inventories, so producers must provide excellent service; the market served from production or terminal point is generally within 150

---

2. On September 27, 1973 Cargill's salt division reported to the long range planning committee of the Cargill board:

"WHY DOES CEMENT LOOK PROMISING FOR THE SALT DEPARTMENT
1. Distribution, marketing and some production aspects of cement are very *similar* to salt.
2. Opposite *seasonality* of salt and cement which would balance out the Salt Department's sales throughout the year.
3. Demand is growing at a rate of 3-4% per year and it is estimated that this rate of growth will continue until at least 1980.
4. A world shortage of cement is developing which limits the amount of competition from foreign imports.
5. Recently prices have been trending upward. Industry representatives are optimistic that more realistic price increases will be allowed in the near future.

6. The industry is presently in a slump, which affords ease of entry, but a critical point of turn-around is forthcoming.
WHY DOES CEMENT LOOK PROMISING FOR CARGILL, INCORPORATED
1. The cement industry is capital intensive, which keeps the industry tied to a relatively few companies that are large and have 'staying power'.
2. It is a basic industry to the U.S. economy and its pattern can be closely monitored by watching G.N.P.
3. Cement is a basic bulk commodity which would enable Cargill to utilize its transportation expertise, both in relation to land and water.
4. Cement is an international commodity which would fit into Cargill's international operations readily."

2a. Without any expansion Cargill would be acquiring a company (Missouri Portland) which is presently the number one company in three large metropolitan markets and number two in another.

miles; the quarrying of limestone is similar to mining salt; the needs and caliber of the sales force is the same; production equipment is similar for cement and salt; and there are two or more competitors calling on customers on a regular and frequent basis.

It was recommended that Cargill acquire a plant producing between 1½ and 3 million barrels per year. Missouri Portland's present capacity is about 10 million barrels per year. Cargill's management had advised the Salt Group that it could spend no more than $10 million for entry into the cement industry. Cargill thereafter decided to spend substantially more than $10 million. The Salt Group had previously recommended the acquisition of a small cement company or plant. Mr. Kelm testified that the Salt Department was in the best position to judge the proper size of an efficient cement plant.

At this point Cargill's interest in the cement industry spurred concrete approaches to cement companies. While many cement companies were studied, 23 of the 51 United States cement companies were actually contacted by letter as to whether they were interested in acquisition by Cargill. Thirty-one companies were finally contacted either in person or by letter. Executive level meetings were also held with ten companies who responded positively. Extensive discussions were held relating to the acquisition of the assets or part of the assets of several cement companies, including Valley Cement Industries, Alpha Portland Cement Company, American Cement Company, Coplay Cement Company and the River Cement Plant. Except for American Cement Company, all of the above firms, or the specific assets sought to be acquired by Cargill, are smaller than Missouri Portland. We find that acquisition of these and other firms was feasible and seriously considered by Cargill.

On September 27, 1973 Mr. Leisz submitted to the Long Range Planning Committee a report which repeated the desirability of entry into the cement industry and recommended purchasing either Coplay or Valley Cement Company. Coplay Cement possesses approximately ⅔ of Missouri Portland's present capacity. Valley Cement possesses approximately ⅟₁₁ of the capacity of Missouri Portland. The September 27, 1973 report also stated that the Financial Department viewed Missouri Portland as the number one potential tender offer target. The list included several other companies, some smaller than Missouri Portland. The Long Range Planning Committee at this time concluded that it was disposed to invest $20 to $40 million to enter the cement industry and that Missouri Portland was its first choice.

This Court finds that there is no evidence that Cargill would not enter the cement industry through some other company if it did not acquire Missouri Portland. In fact, the extensive research, study and pursuit of entry by Cargill into the cement business is conclusive of one thing—Cargill has amply demonstrated its intention to enter the cement industry. This intention is well known to the cement industry because of Cargill's active conduct in attempting to enter the industry before actual contact was made with Missouri Portland [3] and long before initiating its tender offer. The fact that there are large cement companies outside the markets relevant in this case does not as a matter of fact make them likely entrants. Finally, based upon the evidence of Cargill's subjective interest in the cement industry as well as the abundant objective criteria which makes the cement industry perfect for Cargill's diversification plans, this Court finds that Cargill was for some time and still is the most likely potential entrant into the cement industry markets in which Missouri Portland has been found to be dominant.

3. After Cargill's initial acquisition inquiry was turned down by Missouri Portland, it reviewed other alternatives and recontacted Universal Atlas, Amcord, Dundee Cement and River Cement. After these inquiries Cargill decided to attempt to acquire Missouri Portland through a tender offer.

*Balancing the Equities.*

*Cargill's Interest.*

Cargill will not be foreclosed from renewing its tender offer at a future time if this Court decides at the trial on the merits that there are no antitrust violations. Thus, enjoining the tender offer results in inconvenience and financial loss of what would amount to processing a new tender offer.

*Missouri Portland's Interests.*

On the other hand, if the tender offer were allowed to proceed, Missouri Portland would be seriously harmed; its corporate situation would be seriously prejudiced. Serious disruption to Missouri Portland's personnel would result from having Cargill as a substantial owner pending the trial. Long-range planning and hiring would be significantly impaired. The returning of shares to the market and the unscrambling of the assets would present substantial difficulties and might well result in serious harm to Missouri Portland and its shareholders. This Court finds that harmful practical effects on Missouri Portland and its shareholders would result if the tender offer were allowed to proceed, whereas the termination has inconsequential effects as to Cargill.

*Conclusions of Law as to Antitrust Allegations.*

■ The acquisition of Missouri Portland by Cargill raises substantial and difficult antitrust questions as to whether such action would eliminate a prime potential toehold entrant, eliminate a significant and well-known competitor on the edge of the market, and entrench or add to the existing dominance of a competitor in the relevant cement markets. Courts have found that any one of these three anticompetitive effects constitutes a violation of Section 7 of the Clayton Act. The market con-

ditions and the size and positions of the corporations involved are crucial factors in determining what acts are likely to have the effect of substantially lessening competition.

■ In addressing the antitrust issues before this Court, we are concerned, as was Congress, with "probabilities not certainties." [4] Section 7 of the Clayton Act provides that:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. 15 U.S. C. § 18.

One of the primary objectives of Congress when enacting this statute was to impede any trend towards economic concentration in its incipiency.[5] The legal analysis of the findings in this case must be consistent with the purpose of the Clayton Act and must be made in light of what other courts and the Federal Trade Commission have found to be situations tending to substantially lessen competition.

A brief analysis of the corporations and markets involved in this action is important before proceeding to discuss the likelihood of each of the above described anticompetitive effects resulting from Cargill's acquisition of Missouri Portland.

*The Degree of Concentration in the Relevant Market Areas.*

■ To consider the Midwestern states as a whole as being the relevant market area for purposes of determining anticompetitive effects of the challenged

---

4. Brown Shoe Co. v. United States, 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

5. *See id.* at 317, 82 S.Ct. 1502. "A requirement of certainty and actuality of injury to

competition is incompatible with any efforts to supplement the Sherman Act by reaching incipient restraints." S.Rep.No.1775, 81st Cong., 2d Sess. 6.

acquisition would be to ignore the purpose of the Clayton Act, and to ignore the practical economic realities of the portland cement industry. The following data shows the degree of concentration of the portland cement industry in four metropolitan areas and the degree of dominance of Missouri Portland in those areas:

St. Louis, Missouri
Metropolitan Marketing Area

| | |
|---|---|
| Missouri Portland Cement | 28% |
| River Cement | 24 |
| Alpha Cement | 20 |
| Universal Atlas Cement | 18 |
| Top 4 | 90% |
| Dundee Cement | 10% |

Kansas City, Missouri
Metropolitan Marketing Area

| | |
|---|---|
| Missouri Portland Cement | 30% |
| Lone Star Cement | 25 |
| Ash Grove Cement | 22 |
| Universal Atlas Cement | 12 |
| Top 4 | 89% |
| Monarch Cement | 5% |
| General Portland Cement | 5 |
| Dewey Cement | 2 |

Memphis, Tennessee
Metropolitan Marketing Area

| | |
|---|---|
| Missouri Portland Cement | 30% |
| Marquette Cement | 27 |
| River Cement | 21 |
| Arkansas Cement | 10 |
| Top 4 | 88% |
| Other | 12% |

Omaha, Nebraska
Metropolitan Marketing Area

| | |
|---|---|
| Ash Grove Cement | 62% |
| Missouri Portland Cement | 21 |
| Lone Star Cement | 10 |
| Ideal Cement | 5 |
| Top 4 | 98% |
| Other | 2% |

Section 7 of the Clayton Act rules out acquisitions "in any section of the country" which may substantially lessen competition. An acquisition which would probably result in the substantial lessening of competition in the metropolitan areas of St. Louis, Missouri; Kansas City, Missouri; Memphis, Tennessee and Omaha, Nebraska constitutes a violation of Section 7.

■ To determine the probability of an anticompetitive effect of an acquisition there are certain indicia which courts require to be demonstrated by the party attacking the acquisition. First there must be a relevant product line. Portland cement is the relevant product line.[6] Next, the degree of concentration in relevant market areas must be high or at least tending towards a high level of concentration. In the cement market areas, relevant in this case, concentration has been shown to be greater than that in the *Falstaff,*[7] *Procter & Gamble*[8] and *Kennecott*[9] cases. In the recent past other courts have examined the high concentration of the cement industry in the same market areas (Kansas City and Memphis) as are before this Court and have concluded that:

The finding by the Commission [FTC] that there is a trend toward concentration in the designated markets as well as in the industry as a whole is not contested. . . . The percentages of concentration previously referred to in these markets have been held to be unduly high in previous antitrust cases.[10]

---

6. Portland cement has been held to be a relevant product line in Mississippi River Corp. v. F. T. C., 454 F.2d 1083, 1090 (8th Cir. 1972) ; United States Steel Corp. v. F. T. C., 426 F.2d 592, 596 (6th Cir. 1970).

7. In United States v. Falstaff Brewing Corp., 410 U.S. 526, 527–528, 93 S.Ct. 1096, 35 L.Ed.2d 475, the four largest beer companies controlled 61% of sales and the eight largest controlled 81%.

8. The top two companies controlled 65% of bleach sales and the top six companies controlled approximately 80% of the market in

F. T. C. v. Procter & Gamble Co., 386 U.S. 568, 571, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

9. As to the coal industry the court in Kennecott Copper Corp. v. F. T. C., 467 F.2d 67, 73 (10th Cir. 1972), cert. denied —— U. S. ——, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974), found that the top four companies controlled 29% of coal production and the top eight controlled 39%.

10. Mississippi River Corp. v. F. T. C., 454 F.2d 1083, 1092 (8th Cir. 1972). *See also* United States Steel Corp. v. F. T. C., 426

In 1966 the Federal Trade Commission expressed its deep concern with the concentrated nature of the cement industry and concluded:

A comparison of concentration figures on a state basis with similar data for other products shows cement to be among the most highly concentrated products. The median four-firm 'State' concentration ratio for portland cement was 83 percent. This is higher than most other regional industries.[11]

We note in passing that Cargill's own analysis of the industry reflected indicia of a concentrated industry.

■ The high degree of concentration in the cement industry especially in regional submarkets makes any acquisition which would cause further concentration particularly suspect.[12]

■ The evidence in this case, prior F.T.C. determinations and findings by other courts make it clear to this Court that there is a high degree of concentration in the portland cement industry. The evidence also shows that Missouri Portland is in a dominant position in the relevant submarket areas. We conclude that there is substantial evidence to support a conclusion that the acquisition of Missouri Portland by Cargill would be a significant element in increasing the already concentrated ratios of the leading firms in the cement industry.

We now turn our attention to the specific ways in which Cargill's acquisition in this case will violate the Clayton Act.

The three possible anticompetitive effects of the challenged acquisition are discussed below:

■ 1. Cargill's acquisition of Missouri Portland will eliminate Cargill as an additional competitor in highly concentrated regional submarkets in the portland cement industry. The loss of a most likely entrant as a *de novo* or toehold entrant in a concentrated market is likely to cause a substantial anticompetitive effect in the relevant submarkets. This conclusion has been reached by the Supreme Court on numerous occasions.[13]

It is apparent from the findings in this case that Cargill is engaged in business activity directly related to the portland cement industry and has clearly demonstrated its desire to enter the portland cement business. In *Procter & Gamble, supra*, the Supreme Court established a factual analysis test in determining the likelihood of entry into the industry by an acquiring company. The factual situation in the *Procter & Gamble* case presented many of the same factors that make the portland cement industry a natural area for diversification by Cargill.

The court stated in *Procter & Gamble*:

Liquid bleach was a natural avenue of diversification since it is complementary to Procter's products, is sold to the same customers through the same channels, and is advertised and merchandised in the same manner. Procter had substantial advantages in advertising and sales promotion,

---

F.2d 592 (6th Cir. 1970), in which the court made the following conclusion as to concentration:
> Any increase in concentration in industries whose concentration levels are already "great" is alarming because such increases make so much less likely the possibility of eventual deconcentration. *Id.* at 602.

11. Economic Report on Mergers and Vertical Integration in the Cement Industry, Staff Report to the Federal Trade Commission, April 1966, at p. 7.

12. *See* United States v. Penn-Olin Chemical Co., 378 U.S. 158, 171–172, 84 S.Ct. 1710,

12 L.Ed.2d 775 (1964); United States v. Aluminum Co., 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

13. *See* United States v. Falstaff Brewing Corp., 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973); Ford Motor Co. v. United States, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972). *See also* F. T. C. v. Procter & Gamble Co., 386 U.S. 568, 87 S. Ct. 1224, 18 L.Ed.2d 303 (1967); United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); Kennecott Copper Corp. v. F. T. C., *supra*.

which, as we have seen, are vital to the success of liquid bleach . . . . Procter's management was experienced in producing and marketing goods similar to liquid bleach. Procter had considered the possibility of independently entering but decided against it because the acquisition of Clorox would enable Procter to capture a more commanding share of the market. 386 U.S. at 580–581, 87 S.Ct. at 1231.

It is apparent from this Court's findings that Cargill is just as likely an entrant into the cement industry as Procter was into liquid bleach.

In *Falstaff* the Supreme Court reiterated its objective test as to what factors are determinative in deciding whether a corporation is a prime potential entrant. It stated:

> The specific question with respect to this phase of the case is not what Falstaff's internal company decisions were but whether, given its financial capabilities and conditions in the New England market, it would be reasonable to consider it a potential entrant into that market. 410 U.S. at 533, 93 S.Ct. at 1101.

Cargill, a company of huge financial capabilities, comes squarely within the purview of the Supreme Court's objective test.

This Court has found Cargill to be a prime entrant, in fact the most likely potential entrant,[14] into the highly concentrated cement industry. The crux of a conclusion that antitrust violations

have occurred is that a likely entrant is entering the market by acquiring a dominant firm instead of entering *de novo* or by toehold entry.[15] The anticompetitive effect of this acquisition is the elimination of additional competition that Cargill would engender if it entered independently or by toehold acquisition.[16] Toehold or *de novo* entry by Cargill would have put it in competition with Missouri Portland. In the *Procter & Gamble* case the Supreme Court concluded under very similar circumstances that:

> The anticompetitive effects with which this product-extension merger is fraught can easily be seen: (1) the substitution of the powerful acquiring firm for the smaller, but already dominant, firm may substantially reduce the competitive structure of the industry by raising entry barriers and by dissuading the smaller firms from aggressively competing; (2) the acquisition eliminates the potential competition of the acquiring firm. 386 U.S. at 578, 87 S.Ct. at 1230.[17]

We conclude that the loss of Cargill as a competitor in a concentrated cement market by its acquisition of Missouri Portland is likely to substantially lessen competition or at the very least raises serious questions as to the anticompetitive effects resulting therefrom.

2. The challenged acquisition raises a serious possibility of a second anticompetitve effect resulting from the elimination of Cargill's disciplining influence on competition caused by its

---

14. *See* p. 19 *supra.*

15. There is no distinction in principle between *de novo* and toehold entry. In United States v. Falstaff Brewing Corp., 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), the court noted that "reference to *de novo* entry includes 'toe-hold' acquisition as well." 410 U.S. at 530 n. 10, 93 S.Ct. at 1099. It is significant to note that the District Court in Falstaff faced evidence that management had consistently rejected *de novo* or toehold entry. *Id.* at 530, 93 S.Ct. 1096. There is no such evidence in the instant case. *See also* Procter & Gamble, *supra,* 386 U.S. at 580, 87 S.Ct. 1224.

16. *See* United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964).

17. *See also* Ford Motor Co. v. United States, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972) (Acquisition of Autolite, spark plug manufacturer, was anticompetitive, *inter alia*, because it precluded the competition that may have resulted from the independent entry of Ford into the spark plug business.); United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); Kennecott Copper Co. v. F. T. C., *supra.*

presence as a potential competitor on the fringe of the market. When a large company like Cargill decides to enter an industry intimately related to its own, such decision exerts an influence on the competitive forces in the market place. When faced with situations similar to this action the Supreme Court has concluded:

> Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market. Falstaff, *supra,* 410 U.S. at 531–532, 93 S.Ct. at 1100.[18]

The decision by Cargill to enter the cement industry, Cargill's vast resources and the probability of Missouri Portland's already dominant position being expanded are facts well known to the companies in the portland cement industry.

The Supreme Court commented on this situation in the *Penn-Olin* case:

> The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated. 378 U.S. at 174, 84 S.Ct. at 1719.

The evidence before us brings this case well within the relevant factors and applied principles of the *Falstaff, Procter & Gamble, Penn-Olin* and *Ford* cases.

This Court holds that substantial and difficult antitrust questions are raised by Cargill's acquisition because the acquisition eliminates from the edge of the market a huge corporation with expressed intentions to enter the highly concentrated portland cement industry.

■■■■■ 3. The acquisition of and subsequent grafting of Cargill's huge financial resources and competitive advantages onto Missouri Portland, already dominant in highly concentrated submarkets, will raise significant barriers to entry into those markets and will increase the dominance of Missouri Portland in the already concentrated markets. Prohibiting an acquisition which will tend to increase the concentration of a market and heighten barriers to entry into the market is at the very heart of the purpose and the explicit language of Section 7 of the Clayton Act. As the 10th Circuit stated in the *Kennecott* case:

> The trend towards high concentration is material. Moreover, the preservation of the possibility of future deconcentration is a legitimate aim, and the inhibition of that possibility, because of the acquisition, is a relevant factor in assessing illegality. [Citations omitted.] 467 F.2d at 78.

Just because there are large companies or subsidiaries of large companies in and around the market which theoretically have the resources to compete strongly or to overcome the barriers and enter the market does not necessarily mean there is healthy competition in that market. Most antitrust actions arise in an atmosphere where if the court were to look at the universe of possible competitors and entrants, and ignore the present and actual structure of the market few mergers would ever be prohibited. The evidence before this Court shows that the portland cement industry is in short supply tending toward higher concentration with barriers to entry continually rising because of the capital intensive structure of the business. It further shows that Cargill

18. The Court reversed the District Court in Falstaff for failing to have appraised the economic facts about Falstaff and the New England Market in order to determine whether Falstaff was actually "a potential competitor on the fringe of the market with likely influence on existing competition." 410 U.S. at 534, 93 S.Ct. at 1101.

will be acquiring and expanding a company already dominant in the relevant markets.

In the *Falstaff* and *Procter & Gamble* cases, the Supreme Court addressed itself to similar situations. It stated in *Falstaff* that Section 7:

> . . . bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, F. T. C. v. Procter & Gamble Co., 386 U.S. 568, 578–580, [87 S.Ct. 1224, 1230–1231, 18 L.Ed.2d 303] (1967). 410 U.S. at 531, 93 S.Ct. at 1100.

In *Procter & Gamble* the Court clearly stated its position against acquisitions like the one before this Court in the following pertinent language:

> [T]he substitution of the powerful acquiring firm for the smaller, but already dominant, firm may substantially reduce the competitive structure of the industry by raising entry barriers and by dissuading the smaller firms from aggressively competing. . . . 386 U.S. at 578, 87 S.Ct. at 1230.[19]

Cargill's acquisition of Missouri Portland raises a clear threat that competition will be substantially lessened because such acquisition will tend to increase the concentration of the market and make the barriers to entry higher than they are already.

Missouri Portland at the very least raises serious antitrust issues the resolution of which necessitates further investigation as to whether the challenged acquisition will substantially lessen competition in the above discussed metropolitan areas. As discussed in the findings, very little, if any, harm will result to Cargill if it is presently enjoined from carrying out its tender offer. Missouri Portland will suffer serious and irreparable harm caused by the disruptive effect on Company .morale, the difficulties of unscrambling merged assets and the adverse effect on it for being involved in an antitrust violation.[20] The interest of the public also clearly favors enjoining an acquisition which may substantially lessen competition.

## II   Securities Law Claims

We now turn to the part of this case marked more by overzealousness than by unlawful activity. The securities claims and counterclaims, as will be reflected in the findings and conclusions below, present issues about which reasonable men could differ. But plaintiff's claims as to securities law violations do not alone raise serious enough questions to warrant the granting of a preliminary injunction. We also address defendants' counterclaims at this time so that the Court of Appeals will be able to rule on this issue without remand in the event that it allows the tender offer to proceed.

### Cargill's Tender Offer.

Cargill announced and filed a 13D Statement and an Invitation for Tenders on December 19, 1973 as its offer to purchase all of the outstanding common stock of Missouri Portland for cash at $30.00 per share. The Offer was to expire, unless extended at the option of Cargill, on January 4, 1974. The tender offer provided that shares tendered could be withdrawn through December 27, 1973 and, unless purchased by Car-

19. See Mississippi River Corp. v. F. T. C., 454 F.2d 1083, 1090 (8th Cir. 1972) for a similar holding in which the industry and market areas were the same as those before this Court. The court simply stated that the acquisition would substantially lessen competition because "[b]arriers to entry in a market strengthen the market power of existing firms allowing the use of oligopolistic power with relative safety from new competition. Any new barriers make a strong market position even stronger." *Id.* at 1092.

20. *See* Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc., 476 F.2d 687 (2d Cir. 1973); Elco Corp. v. Microdot Inc., 360 F.Supp. 741, 753–754 (D.Del.1973).

gill in the interim, could also be withdrawn after February 17, 1974. The offer further provided that tendered shares would be paid for promptly, effective December 28, 1973. There is disagreement between the parties as to the effect of the conditions under which Cargill would not be required to meet its obligation to pay for shares tendered but not paid for. The conditions set out in the Offer to Purchase [21] essentially provide that in the event Missouri Portland issued additional security, initiated legal action or entered into an agreement of merger or to sell its assets, then as provided by paragraph 3, certificate of tendered shares not purchased "will be returned without expense to the tendering stockholder as promptly as practicable."

The offer originally included only financial information relating to fiscal year 1973.[22] The Offer also required Cargill to give upon request of Missouri Portland shareholders more detailed financial information. Then on December 31, 1973 Cargill filed additional financial information covering fiscal year 1972.[23]

Cargill's Offer to Purchase included a statement as to what business plans it had in mind for Missouri Portland. Such statement put Missouri Portland's shareholders on notice of the possibility that Cargill might make business changes according to what it deemed was in the best interest of Missouri Portland.[24] Lastly, Cargill made no mention of possible antitrust violations arising out of the proposed acquisition.

### Actions Taken by Parties Since Announcement of Tender Offer.

A special meeting of the Missouri Portland board was convened on December 18, 1973 at which time a resolution was passed authorizing management to take action to resist the tender offer. At this meeting the Chairman, Mr. Alexander, was given a seven-year employment contract. The contract, his first, requires that Missouri Portland pay Mr. Alexander $118,000/year for a seven-year term. The contract further provided that severance pay would be given to Mr. Alexander if Missouri Portland should terminate his employment with-

21. "7. Certain Conditions of the Offer. The Purchaser shall not be required to purchase or pay for any Shares tendered if, before the time of payment therefor, in the judgment of the Purchaser's management: (a) Missouri shall have issued or authorized the issuance of . . . other securities in respect of, in lieu of, or in substitution for the now outstanding shares . . . or (b) Missouri or any of its subsidiaries shall have entered into an agreement or otherwise committed itself with respect to a merger, consolidation, acquisition of assets, disposition of assets, or other comparable event not in the ordinary course of business, or (c) there shall have been instituted or threatened any action or proceedings before any court or administrative agency, by any government agency or any other person, challenging the acquisition by the Purchaser of the Shares or otherwise relating to this Offer, or otherwise materially adversely affecting Missouri or the Purchaser."

22. "For the fiscal year ended May 31, 1973 the Purchaser had net sales of $5,270.4 million and net income of $107.8 million. At May 31, 1973, the Purchaser had gross assets of $1,112.9 million. net current assets

of $251.3 million and net worth of $352.4 million."

23. "For the fiscal years ended May 31, 1973 and May 31, 1972 the Purchaser had sales of merchandise, products and services of $5,336.9 million and $3,476.7 million, respectively, and net income of $107.8 million, and $40.2 million respectively. At May 31, 1973 the Purchaser had assets of $1,103.9 million, net current assets of $251.3 million and net worth of $352.4 million, as compared to May 31, 1972 at which date the Purchaser had assets of $791.0 million, net current assets of $117.4 million, and net worth of $246.3 million."

24. The Offer to Purchase stated:
"Except as described above, the Purchaser does not have any plan or proposal to liquidate Missouri, to sell its assets or to merge it with any other person, nor does the Purchaser at this time plan or propose any changes in the business of Missouri since the Purchaser wishes to review the situation in the light of circumstances prevailing if and when it acquires control of Missouri and at this time it reserves the right to make such changes as it deems in the best interest of Missouri's business."

out just cause or if he should terminate for good reason.[25]

Missouri Portland filed the present action on December 21, 1973. Then, on December 24, 1973 at a special meeting of the Missouri Portland board the board declared a 25 percent stock dividend and also declared the customary quarterly dividend rate of 40 cents per share. The cash dividend was to be paid on all outstanding shares thus increasing the dividend amount paid to those shareholders participating in the 25 percent stock distribution.[26] The motivation for this stock distribution has been seriously challenged by Cargill. It contends that "the primary purpose of the stock distribution was to defeat the Cargill tender offer." On the other hand, retained earnings of Missouri Portland had grown to $5 million and an increase in shares was well within the authorized limit. Although it seems likely that the timing of the dividend was strongly influenced by the tender offer, the stock distribution resulting in a dividend increase was justified as a proper business decision based on Missouri Portland's financial position.

*Communications by Missouri Portland to its Shareholders.*

Cargill attacks Missouri Portland's communications to its shareholders contending that the statements were misleading and omitted material facts. The communications failed to disclose that Missouri Portland had authorized Smith, Barney & Co. to purchase 100,000 of its own shares throughout 1973 at not more than $30 per share.[27] This purchase plan which resulted in the purchase of 85,000 shares was undertaken because Missouri Portland believed that its shares were undervalued and by purchasing shares from the market and holding them as treasury shares it hoped to increase the market price per share. This business decision did not constitute a judgment that the shares were worth any certain amount.

Missouri Portland also stated in its December 28, 1973 *Wall Street Journal* advertisement that shareholders who tendered could be "locked in" without being paid for their stock and would not be able to use or sell their stock.[28] This

25. Just cause was defined as willful failure to perform such duties as may be assigned, gross misconduct, engaging in competitive conduct or incapacitation by reason of health for 12 consecutive months. Good reason would exist if Mr. Alexander was assigned to duties other than those customarily performed, was transferred from the St. Louis area, or if he received a reduction in compensation. [Exhibit I in Evidence ¶ 6].

26. Missouri Portland's advertisement in *The Wall Street Journal* of December 28, 1973 stated:

1. On December 24, 1973 your Board of Directors voted a 25% stock distribution on all shares of Missouri Portland common stock outstanding. This distribution—which means you will receive one additional share of Missouri Portland common stock for each four shares you now own—will be payable on January 18, 1974 only to stockholders of record at the close of business on January 7, 1974. (Three days after Cargill's offer will expire.)

You are cautioned that if you sell your shares or tender them to Cargill you will not be entitled to receive the stock distribution.

27. In *The Wall Street Journal* of December 28, 1973 the advertisement states:

We believe that there are important reasons why your investment in Missouri Portland, and ours, is worth substantially more than what Cargill is bidding. Here are additional facts which you should consider carefully before deciding whether to dispose of your investment:

What is Cargill after?

It stands to reason that if Cargill is willing to pay you $30 a share for your Missouri Portland stock it must see a much greater value in your Company. The $30 bid is below book value. Estimated book value at September 30, 1973, unaudited, was $31.52 per share. In management's opinion, the cost of duplicating our assets today would be more than $200,000,000 or $138. per share.

28. See n. 21 *supra* for the terms of Cargill's Tender to Purchase. The advertisement read:

. . . If you tender now you could be 'locked in' from December 27, 1973 until February 17, 1974 and not be able to withdraw your stock should you wish to do so. While locked in, you would not be

Court finds that this statement as to the possibility of being "locked in" is accurate, although the likelihood of being "locked in" was tenuous. Two of the conditions,[29] issuance of additional securities and the initiation of court action, which would allow Cargill not to pay for shares tendered, had occurred. The offer states that the shares would be returned as promptly as practicable, so the possibility of being locked in was not foreclosed.

On January 3, 1974 the following advertisement appeared in *The Wall Street Journal:*

> 1. This is Cargill's first bid. Cargill has indicated that it would like to acquire all of Missouri Portland's outstanding Common Stock. If Cargill does not get all of the Missouri Portland stock it seeks, you should ask yourself whether Cargill is likely to buy additional shares at a price higher than $30 per share—either in the open market or by raising its tender price. Cargill has reserved the right to do just this in its tender offer.

Paragraph 3 of Cargill's Offer to Tender states:

> If, prior to the expiration of this Offer, the Purchaser shall improve the terms of this Offer, such improvement shall extend to all Shares tendered·and purchased prior thereto.

Also in the January 3, 1974 advertisement Missouri alerted its shareholders

to the present price of its stock which was just above $30.[30]

As a final note on the subject of communication between the parties, we find that Cargill did not mention in its ad of January 2, 1974 in The Wall Street Journal [31] that Missouri Portland's stock distribution apparently constituted one of the three conditions in the tender offer which nullified Cargill's obligation to pay for tendered shares.

*Conclusions of Law as to Securities Claims.*

Sections 14(d) and (e) of the Securities Exchange Act of 1934 (the Williams Act) is the statute which governs the claims and counterclaims before this Court as to alleged securities law violations. In pertinent part the statute provides:

> § 14(e). It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation. . . .

The purpose behind this section is to provide investors with such disclosure as will give them adequate information

---

> able to sell your stock elsewhere if you suddenly needed cash or if a more favorable offer were made. Nor would you be able to borrow on your stock.

29. *See* n. 21 *supra.*

30. "Missouri Portland's recent market price has exceeded $30 per share. On December 28, 1973 Missouri Portland's stock sold on the New York Stock Exchange at a high of $30⅝ and closed at $30⅜ per share. On December 3, 1973 its stock sold at a high of $30½ and closed at $30½. *I urge you to consult your newspaper for the current market price.*"

31. "On December 24, 1973, Missouri announced a 25% stock distribution on its outstanding shares of Common Stock payable on January 18, 1974 to stockholders of record on January 7, 1974 and also announced the payment of the quarterly dividend of $.40 per share payable March 15, 1974 to stockholders of record on February 20, 1974 which is equivalent to a 25% increase in the quarterly dividend. Neither such 25% stock distribution nor such cash dividend increase affects the Purchaser's Offer of $30 per share which expires on January 4, 1974 . . . ."

with which to decide to accept or reject the tender offer.[32]

*Missouri Portland Securities Claims.*

Plaintiff urges this Court to conclude that Cargill's offer to purchase and its subsequent acts related thereto were false and misleading and violated Sections 14(d) and 14(e) of the Securities Exchange Act of 1934 in that (1) the offer failed to provide sufficient financial information as to Cargill; (2) it failed to define Cargill's plans to change the nature of Missouri Portland's business; (3) the possibility of antitrust violations arising out of the acquisition was not revealed by Cargill; (4) Cargill stated that Missouri Portland's stock distribution did not affect the tender offer; and (5) Cargill told Missouri Portland that it would not make an unfriendly tender offer and thus impaired the latter's ability to resist.

■■■ As to the last allegation, none of the communications between Cargill and Missouri Portland before the tender offer rise to the level of a violation of the Securities Exchange Act of 1934. These were strictly business dealings and negotiations. There is nothing in the record before us that would cause this Court to conclude that either party engaged in any impropriety prior to the announcement of the tender offer.

As to Missouri Portland's first claim, there is no mystical number of years for which financial statements should be submitted, which will give shareholders sufficient data to make up their minds to tender or not. It has been ordered however in this circuit that under circumstances similar to those before this Court, two years of financials must be provided to shareholders of the target company.[33] Schiavone, the acquiring company, was a closed corporation which showed "a clear picture of increasing profitability" changing from a loss of $259,000 in fiscal 1972 to a profit of $233,000 in fiscal 1973 and a $618,000 profit for the first quarter of fiscal 1974. Cargill's pattern is very similar. Net income for 1972 was $40.2 million, for 1973 it was $107.8 million. Cargill filed additional information on December 31, 1973 before a large percentage of the tendering was done.

■■■ A stockholder might decide to retain his stock in the target company if the acquiring company looked like a strong investment. He might decide otherwise if the financial status of the acquiring company was gloomy. Shareholders of a target company must be provided financial data for as many years as are necessary for such stockholders reasonably to assess the offer-

---

32. "It has been argued that a cash tender offer is a straightforward business proposition which can be rejected or accepted by a shareholder like any other bid for his securities. But where no information is available about the persons seeking control, or their plans, the shareholder is forced to make a decision on the basis of a market price which reflects an evaluation of the company based on the assumption that the present management and its policies will continue.

The persons seeking control, however, have information about themselves and about their plans which, if known to investors, might substantially change the assumptions on which the market price is based. This bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision.

\*     \*     \*     \*     \*

The bill avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.

While the bill may discourage tender offers or other attempts to acquire control by some who are unwilling to expose themselves to the light of disclosure, the committee believes this is a small price to pay for adequate investor protection. In fact, experience under the Securities Act of 1933 and the Securities Exchange Act of 1934 has amply demonstrated that the disclosure requirements of the Federal securities acts are an aid to legitimate business transactions, not a hindrance." 2 U.S.Code Cong. & Admin.News, 90th Cong., 2d Sess. (1968) at pp. 2813–14.

33. *See* Corenco Corp. v. Schiavone & Sons, Inc., 362 F.Supp. 939 (S.D.N.Y.1973).

or's business prospects. Therefore, under the circumstances, we conclude that the additional financial information provided by Cargill was adequate and was filed before the major part of the tendering occurred.

As with each of the securities law claims, what this Court requires under the Williams Act concerning financial statements should be regarded as the very minimum standard for disclosure. It is hoped that the Williams Act, as well as the other disclosure and antifraud provisions of the Securities Exchange Act of 1934, would cause corporations to act, not as close as possible to the fine line between adequate disclosure and omission, or between a questionable statement and misrepresentation, but rather to give full and clear statements to shareholders at all times.

■ Missouri Portland's second major allegation as to the deficiency in Cargill's Offer to Purchase is its failure to inform Missouri Portland's shareholders of its plans to make major changes in their company's business. In this respect, 17 C.F.R. § 240.13d–101 item 4 requires the tenderor to state the purpose of the proposed purchase and specify any contemplated major change in the business or corporate structure of the target company. Cargill's statements as to its plans to make large capital expenditures to expand Missouri Portland is not such a change and does not appear to be so definitely decided as to make Cargill's statement in its Offer to Purchase misleading.

■ Cargill's failure to disclose the possibility of antitrust violations is claimed by Missouri Portland to be a material omission in its Offer to Purchase. The fact that this Court has issued a preliminary injunction against Cargill on the basis of the antitrust issues presented does not mean that we must automatically conclude that Cargill omitted a material fact because it did not state that there was a likelihood of antitrust violations. To hold such would be to impose a hindsight standard that whenever a court concludes that an acquisition violates the antitrust laws, the acquiring company should have included a statement as to the likelihood of antitrust violations in its tender offer statement.

■ The two cases upon which plaintiff relies [34] stand for the principle that when antitrust violations clearly raise obstacles to the acquisitions, failure to disclose the probable liability for such violations would be to omit a fact of "obvious concern"[35] to the target company's shareholders. But the circumstances in both cases supported a conclusion that the position of the companies and the market conditions were such as to make the probability of antitrust violations clearly apparent at the time of the offer, and the Offer to Purchase should have included such a statement if any conscientious attempt had been made to state basic facts material to shareholders in reaching their decisions. Here, however, it would not have been unreasonable for Cargill's management to have concluded after appropriate inquiry that no substantial antitrust obstacles stood in the way of its acquisition. Therefore, under the circumstances before us, the possibility that the acquisition would result in antitrust violations, a possibility that exists with every merger, need not have been disclosed to Missouri Portland's shareholders.

*Cargill's Allegations as to Securities Violations.*

The conduct of Missouri Portland in opposing Cargill's tender offer raises

---

34. *See* Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc., 476 F.2d 687, 697 (2d Cir. 1973); Elco Corp. v. Microdot Inc., 360 F.Supp. 741, 753 (D. Del.1973).

35. 476 F.2d at 697.

disturbing questions as to whether Missouri Portland's conduct met the minimum standards of conduct required by the Williams Act.

The standards of conduct which the Williams Act imposes on the management of a target company are set forth in a recent case in this circuit, Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 232, 38 L. Ed.2d 148 (1973).

In making this determination we should bear in mind that a major congressional policy behind the securities laws in general, and the antifraud provisions in particular, is the protection of investors who rely on the completeness and accuracy of information made available to them. See 1 Bromberg, Securities Law: Rule 10b–5, § 7.1 at 14 (1971). Those with greater access to information, or having a special relationship to investors making use of the informatioin, often may have an affirmative duty of disclosure. When making a representation, they are required to ascertain what is material as of the time of the transaction and to disclose fully 'those material facts about which the [investor] is presumably uninformed and which would, in reasonable anticipation, affect his judgment'. Kohler v. Kohler Co., 319 F.2d 634, 642 (7th Cir. 1963).

\*  \*  \*  \*  \*  \*

Corporate officers and directors in their relations with shareholders owe a high fiduciary duty of honesty and fair dealing  .  .  .  .  By reason of the special relationship between them, shareholders are likely to rely heavily upon the representations of corporate insiders when the shareholders find themselves in the midst of a battle for control. Corporate insiders therefore have a special responsibility to be meticulous and precise in their representations to shareholders. 480 F.2d at 363–365.

Cargill complains that Missouri Portland violated the Williams Act by statements that its shareholders would be "locked in" for a period of time if they tendered their shares,[36] by its failure to disclose that it had placed a $30 per share limitation on the purchase of its own shares during the preceding year, by its stock split and communications pursuant thereto, and by the seven-year employment contract given to Mr. Alexander immediately after the tender was announced.

█ Based upon our findings, this Court concludes that Cargill has failed to show that Missouri Portland violated the Williams Act by acting in the above described manner. The statements by Missouri Portland, especially as to the "locked in" advertisements, the value of Missouri Portland's stock ($30 or more), and as to its stock split are clearly material according to the test expressed in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). However, although the conduct complained of is material, we conclude that, upon the evidence before this Court, as discussed above, the statements and conduct of Missouri Portland's were accurate and not without basis in fact.

The final allegation by Cargill left to be considered is the claim that Missouri Portland made a material misrepresentation when it implied in its January 3, 1974 advertisement in *The Wall Street Journal* that its shareholders would not be able to take advantage of an improved offer by Cargill. The advertisement clearly implies that if Missouri Portland's shareholders tendered now they would be foreclosed from getting a higher price for their stock in case Cargill made a new offer. Not only does Cargill's offer itself commit Cargill to paying additional consideration to shares already tendered in case a subsequent improvement in the offer were made, but also § 14(d)(7) of the Wil-

36. *See* pp. 39–40 *supra.*

**270**

liams Act requires that any increase in the price of the offer be given to shareholders who had tendered prior to the improved offer.

The advertisement contains a material misrepresentation and clearly violates the Williams Act. Missouri Portland's energetic and possibly over-enthusiastic opposition to Cargill's tender offer as well as this violation of § 14(d) have convinced this Court that we should monitor Missouri Portland's communications to its shareholders in the event that the tender offer is allowed to proceed after the contemplated review on appeal.

*Conclusion.*

Accordingly, it is

Ordered that plaintiff is granted a preliminary injunction enjoining Cargill and anyone acting on its behalf from further soliciting the tender of any Missouri Portland shares; acquiring any Missouri Portland shares as a result of the tender offer; voting any shares of Missouri Portland common stock; and otherwise utilizing such stock as a means of gaining control of Missouri Portland until a full trial on the merits can be held. Plaintiff is denied a preliminary injunction as to its securities claims.

Based on this Court's conclusions as to Cargill's counterclaims it is hereby further

Ordered, in the event that the tender offer is allowed to proceed, that Missouri Portland or anyone acting on its behalf shall not in any way, directly or indirectly, issue any public statement or any communication concerning the tender offer by Cargill without first serving on notice such statement or communication upon the other parties to this action, and unless all parties herein consent to the contents of the proposed draft, the statement shall not be communicated without approval of this Court; and it is further

Ordered that plaintiff Missouri Portland shall give bond forthwith in the sum of One Hundred Thousand Dollars ($100,000.) which shall be held as security for the payment of such costs and damages as may be incurred or suffered by any party who is found to be wrongfully enjoined or restrained.

So ordered.